**2013 UT App 59**

# THE UTAH COURT OF APPEALS

CARL DINGER,

*Petitioner,*

*v.*

DEPARTMENT OF WORKFORCE SERVICES,
WORKFORCE APPEALS BOARD;
AND UTAH TRANSIT AUTHORITY,

*Respondents.*

Opinion
No. 20120093-CA
Filed March 7, 2013

Original Proceeding in this Court

Phillip W. Dyer, Benjamin R. Dyer, and B. Kent Morgan,
Attorneys for Petitioner
Jaceson R. Maughan,
Attorney for Respondent Department of Workforce Services,
Workforce Appeals Board

JUDGE CAROLYN B. MCHUGH authored this Opinion,
in which JUDGES WILLIAM A. THORNE JR.
and STEPHEN L. ROTH concurred.

McHUGH, Judge:

¶1      Carl Dinger challenges the decision of the Workforce Appeals Board (the Board) that he is ineligible for unemployment benefits following his termination from the Utah Transit Authority (UTA). We decline to disturb the Board's decision.

BACKGROUND

¶2      Dinger was hired as a UTA police officer on March 24, 2008, and worked there until his July 15, 2011 termination for insubordination. UTA's "Letter of Termination" indicates that the decision to fire Dinger was based on his "repeated refusal to comport [himself] in conformance with [UTA policies]," despite "five informal notices of insubordination over . . . two years" and a "Written Notification for another incident of insubordination." In addition, the Letter of Termination indicates that Dinger "refused to answer questions in connection with an Internal Affairs investigation."

¶3      Following his termination, Dinger's claim for unemployment benefits was denied on the ground that he had been terminated "for just cause." Dinger appealed the decision, denying the allegations against him and claiming that UTA's disciplinary actions were retaliatory.

¶4      At an evidentiary hearing before an administrative law judge (ALJ), Dinger testified that during his tenure at UTA he had "filed numerous complaints" with UTA management and outside investigative agencies about the operations at UTA. Dinger alleged that, in response, UTA "subjected [him] to a hostile work environment" and fabricated allegations of insubordination against him. Contrary to Dinger's account of events, his supervisors testified that he had been repeatedly insubordinate during his tenure at UTA. They reported that Dinger refused to sign two semi-annual performance evaluations because they stated he was argumentative with supervisors and had "negative interactions" with other employees. One supervisor, who had rejected three of Dinger's incident reports as illegible, described a meeting on January 30, 2011, during which Dinger became argumentative. The supervisor stated, "[Dinger] was shouting at me trying to drown out what I was trying to say back to him. . . . So I finally had to tell him just, 'Look, you need to leave my office.'" The supervisor indicated that after Dinger left, a patrol officer who had overheard the exchange

reported that he had remained nearby out of concern for the supervisor's safety. Following that incident, Dinger's lieutenant sent him an email explaining that the lieutenant "had received several complaints regarding [Dinger's] behavior," which included an argument where Dinger raised his voice "to the point of yelling" and "was heard and observed by others in the patrol room." The lieutenant warned, "this behavior is clearly outside of department and UTA policy, which requires professional and respectful conduct when dealing with superiors and co-workers." The email also admonished Dinger concerning his outburst about another officer's performance during a shift briefing, explaining that Dinger's conduct was "inappropriate and unprofessional." The letter instructed Dinger regarding UTA policies on obeying orders of superiors, insubordination, and courtesy and respect for department members and warned, "Any future violation of these policies will be dealt with accordingly."

¶5    Subsequently, Dinger received a written notification of insubordination. The notice alleged that on June 10, 2011, Dinger had "refused to follow a direct order when instructed to respond to a call and became argumentative and hostile when [a sergeant] raised this issue with [him]." The notice reminded Dinger that this act of insubordination was one of four that had followed a June 8, 2010 coaching session[1] on treating supervisors and coworkers with respect and observing the chain of command. The letter concluded that "[c]oaching has failed to correct the insubordinate behavior" and warned that failure to "meet the requirements in this Written Notification" could result in "further disciplinary action up to and including termination." Dinger testified that following this notification, the human resources director offered him $5,000, and

---

1. UTA's Corporate Policy Number 6.3.1 explains that "non-disciplinary performance coaching" may be used "to help employees understand expectations, provide instruction and to monitor progress and performance."

then $15,000, "to leave [and] to hold [him] over to find another job."

¶6     The testimony before the ALJ also indicated that on June 22, 2011, Dinger was instructed to appear for an internal affairs interview.[2] Police Chief Ross Larsen testified that the meeting was conducted "to seek specific answers [to questions] that [UTA] had . . . regarding [Dinger's] conduct." Dinger testified that he believed that he would be terminated at the meeting. At the start of the meeting, UTA read to and presented Dinger with a written warning indicating that his answers could not be used in a criminal proceeding against him and warned that his failure to answer could result in termination of his employment in accordance with *Garrity v. New Jersey*, 385 U.S. 493 (1967).[3] Dinger refused to sign this *Garrity* warning. Instead, he read a statement prepared by his attorney and refused to answer any questions. He was then placed on administrative leave until his July 15, 2011 termination.

¶7     Based on the evidence presented, the ALJ determined that Dinger had "very little notice of the meeting on June 22, 2011," was

---

2. It is unclear from the record how much notice Dinger actually received. He testified that he was notified of the meeting on the day of the meeting. UTA claimed that Dinger had been notified a day prior to the meeting.

3. In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the United States Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." *Id.* at 500. Thus, a police officer who has invoked his Fifth Amendment right against self-incrimination can be disciplined for failing to answer questions only if he was first given a warning that includes the assurance that his answers cannot be used against him in any subsequent prosecution. *See id.*

not informed that he would be given a *Garrity* warning, and was not told that his job was in jeopardy or that he would be discharged if he refused to answer. The ALJ also faulted UTA for not asking Dinger whether, in the future, he might be inclined to answer its questions. Ultimately, the ALJ concluded that Dinger's refusal to answer questions was reasonable and did not amount to insubordination. As a result, the ALJ held that unemployment benefits had been improperly disallowed.

¶8      UTA appealed the decision to the Board, challenging the ALJ's findings of fact. In particular, UTA claimed that it gave Dinger one day's notice of the internal affairs interview and that he was warned orally and in writing at the interview that failing to answer questions could result in termination. UTA also claimed that Dinger's refusal to participate in the interview was the culmination of "a documented pattern of insubordination" and that the interview was part of an investigation into Dinger's alleged "improper workplace conduct."

¶9      On December 1, 2011, the Board reversed the ALJ's decision and denied Dinger benefits on the basis that he was fired for just cause. In a December 21, 2011 letter, Dinger requested that the Board reopen the hearing to take additional evidence and reconsider its determination. The Board declined Dinger's invitation. Dinger now seeks judicial review of the Board's determination.

ISSUES AND STANDARDS OF REVIEW

¶10      Dinger first asserts that he was substantially prejudiced by the Board's determination that he was terminated for just cause. We grant "great deference to an agency's findings, and will uphold them if they are supported by substantial evidence when viewed in light of the whole record before the court." *EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 8, 157 P.3d 334 (citation and internal quotation marks omitted). "When we review an agency's application of the law to a particular set of facts, we

give a degree of deference to the agency," and we will uphold the Board's decision "so long as it is within the realm of reasonableness and rationality." *Id.* ¶ 9 (citation and internal quotation marks omitted).

¶11 Next, Dinger contends that the Board acted arbitrarily and capriciously by denying his motion to reconsider its decision. The rules promulgated by the agency afford the Board the discretion to reconsider its prior rulings. *See* Utah Admin. Code R994-508-401(2) (providing that the Board may review a prior decision and issue a new decision, if appropriate). We review the Board's denial of a request for reconsideration for abuse of discretion. *See Nigohosian v. Workforce Appeals Bd.*, 2009 UT App 242U, para. 2 (mem.).

## ANALYSIS

### I. The Just Cause Determination

¶12 Dinger challenges the Board's factual findings supporting its conclusion that UTA had just cause to terminate him for insubordination. *See* Utah Code Ann. § 63G-4-403(4)(g) (LexisNexis 2011). Accordingly, we must determine whether the findings are supported by substantial evidence when viewing the record as a whole. *See EAGALA*, 2007 UT App 43, ¶ 8. "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997) (citations and internal quotation marks omitted).

### A. Failure to Marshal

¶13 When challenging an agency's factual findings, "'[i]t is the petitioner's duty to properly present the record, by marshaling all of the evidence supporting the findings and showing that, despite that evidence and all reasonable inferences that can be drawn therefrom, the findings are not supported by substantial evi-

dence.'" *EAGALA*, 2007 UT App 43, ¶ 8 (quoting *Department of the Air Force v. Swider*, 824 P.2d 448, 451 (Utah Ct. App. 1991)). The Board argues that Dinger did not marshal the evidence in support of the Board's findings.[4] Dinger contends that he has properly marshaled the evidence and argues in the alternative that, to the extent that he did not, we should exercise our discretion to consider the merits of his claims. *See Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 20, 164 P.3d 384 ("The reviewing court . . . retains discretion to consider independently the whole record and determine if the decision below has adequate factual support."). We agree with the Board that Dinger has not properly marshaled the evidence.

¶14    Dinger's marshaling deficiencies are the result of his decision to focus his appeal almost entirely on whether his refusal to participate in the interview was reasonable. However, the Board concluded that the failure to answer questions during the internal affairs investigation "was not an isolated incident." The Board took into account Dinger's entire record of insubordination in making

---

4. Dinger also claims that the evidence before the Board was incomplete because UTA submitted only three evaluations of his performance while omitting others that showed his performance as "meeting or exceeding UTA's expectations." He includes with his brief to this court an August 2008 evaluation illustrating that point. Although it is stamped "Appeal Adjudication Oct 13 2011 U.D.W.S.," indicating that it was received by the Board in consideration of his request for reconsideration, this evaluation is not part of the record on appeal and Dinger did not seek to modify the record on appeal by including it. *See generally* Utah R. App. P. 11(h) (providing that either party may request that a supplemental record be certified and transmitted to the appellate court). Accordingly, we do not consider it further. *See State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 ("An appellate court's review is . . . limited to the evidence contained in the record on appeal." (citation and internal quotation marks omitted)).

its determination that he was ineligible for benefits. Therefore, the evidence concerning each of those incidents provides support for the Board's decision and should have been marshaled by Dinger. Although Dinger refers to these prior incidents in his brief, he fails to mention the evidence supporting the Board's finding that he had repeatedly been hostile and argumentative with his supervisors. For example, nowhere does he acknowledge that UTA's witnesses reported that Dinger yelled so loudly and inappropriately at his supervisor during the January 30, 2011 meeting that another officer could hear the exchange and was concerned for the supervisor's safety. Instead, Dinger refers to this interaction as "a discussion" in his brief and never addresses the more concerning characterization accepted by the Board. Rather than minimizing the evidence that supports the Board's decision, Dinger was required to set forth those facts and then demonstrate that, despite that evidence, the record is insufficient to support the findings. *See Columbia HCA v. Labor Comm'n*, 2011 UT App 210, ¶ 12, 258 P.3d 640.

B. Substantial Evidence Supports the Findings

¶15 In addition to failing to meet his marshaling burden, Dinger cannot prevail on the merits of his challenge to the Board's decision. First, contrary to Dinger's argument, there was substantial evidence to support the Board's conclusion that UTA had just cause to terminate Dinger. *See* Utah Admin. Code R994-405-201 ("Benefits will be denied if the claimant was discharged for just cause . . . ."). In order to establish just cause, an employer must establish three elements: culpability, knowledge, and control. *See id.* R994-405-202, -203.

¶16 Here, Dinger was terminated for insubordination which can constitute just cause. "An employer generally has the right to expect lines of authority will be followed; reasonable instructions, given in a civil manner, will be obeyed; supervisors will be respected and their authority will not be undermined." *Id.* R994-405-208(4). However, not all disagreements between an employee and his employer rise to the level of insubordination justifying

termination. "In determining when insubordination becomes disqualifying conduct, a disregard of the employer's rightful and legitimate interests is of major importance." *Id.* While "[p]rotesting or expressing general dissatisfaction without an overt act is not a disregard of the employer's interests," expressing "provocative remarks to a superior or vulgar or profane language in response to a civil request may constitute insubordination if it disrupts routine, undermines authority or impairs efficiency." *Id.* An employer has a legitimate interest in maintaining the lines of authority, but "[m]ere incompatibility or emphatic insistence or discussion by a claimant, acting in good faith, is not disqualifying conduct." *Id.*

¶17    In determining whether UTA had just cause to terminate Dinger for insubordination, we first examine the element of culpability, which is shown if "[t]he conduct causing the discharge" is "so serious that continuing the employment relationship would jeopardize the employer's rightful interest." *Id.* R994-405-202(1). In undertaking this analysis, Dinger's prior work record is relevant because if the "conduct was an isolated incident or a good faith error in judgment," then UTA may not be able to establish that the "single violation . . . would be repeated by a long-term employee with an established pattern of complying with [its] rules." *See id.*

¶18    Dinger argues that refusing to participate in the *Garrity* interview by itself did not establish culpability because it "was an isolated incident that was the result of being interviewed by the specific people against whom he [had] filed administrative complaints." He further argues that UTA improperly relied on informal "coaching sessions" as examples of his prior insubordinate conduct and that any prior acts fell into a category of good faith disagreement with UTA, which does not constitute insubordination. *See id.* R994-405-208(4). In support, Dinger points to his testimony before the ALJ asserting that all of the charges were fabricated in retaliation for the complaints he lodged against UTA. The Board concluded otherwise, finding that Dinger had "a long history of insubordinate acts" and that his "behavior disrupted the

work place, impaired efficiency, and undermined his superior's authority." *See id.*

¶19     Nevertheless, Dinger asks us to reject the Board's assessment of the evidence on the ground that UTA relied only on informal coaching sessions and an incomplete record of his performance evaluations. Even if we were to discount the prior notices of insubordination because they were "informal," there is evidence in the record to support the Board's finding. Dinger refused to sign two written performance evaluations that stated he was argumentative with supervisors, and that he "shout[ed]" at a supervisor during a meeting that became so heated that another officer remained to ensure the supervisor's safety. The record also reflects that after informal coaching sessions were ineffective, Dinger was presented with a written notice of insubordination on June 15, 2011. Despite that notice, Dinger's supervisors reported that his insubordination continued.

¶20     Essentially, Dinger asks us to reject the Board's determination that the testimony of the supervisors was more credible than Dinger's. However,

> It is the province of the Board, not appellate courts, to resolve conflicting evidence, and where inconsistent inferences can be drawn from the same evidence, it is for the Board to draw the inferences. Therefore, [w]hen the evidence is disputed, as it was here, we defer to the Board's assessment of credibility and resolution of conflicting evidence.

*Davis v. Department of Workforce Servs.*, 2012 UT App 158, ¶ 6, 280 P.3d 442 (alteration in original) (citations and internal quotation marks omitted).

¶21     The Board found that "over the course of his employment, [Dinger] exhibited an escalating pattern of insubordination" that culminated in his refusal to participate in the internal affairs

investigation. It further determined that Dinger's conduct over time "threatened the reporting structure of [UTA] and negatively impacted its operations." In light of that history of insubordination, the Board concluded that Dinger's refusal to participate in the *Garrity* interview amounted to another act of insubordination and that he was therefore culpable. We accept the Board's determination that UTA's witnesses were credible, and conclude that their testimony provides substantial evidence to support the Board's culpability determination.

¶22    We next consider the element of knowledge. To establish knowledge, an employer must show that the claimant "had knowledge of the conduct the employer expected." Utah Admin. Code R994-405-202(2). "There does not need to be evidence of a deliberate intent to harm the employer; however, it must be shown the claimant should have been able to anticipate the negative effect of the conduct." *Id.* The Board determined that Dinger "knew, or should have known, he was expected to show respect to his superiors and follow their direct orders." The Board concluded that Dinger's "behavioral problems" were addressed on "eight different occasions," that Dinger "was provided with written notification of what behavior [UTA] expected," and that during the June 22 *Garrity* interview, Dinger was notified "that termination was a possible consequence of not cooperating in the interview."

¶23    In arguing that UTA failed to establish knowledge, Dinger limits his argument to his lack of prior knowledge about the conduct expected of him at the *Garrity* interview. Again, the Board's decision is based on a pattern of incidents in which Dinger was argumentative with his supervisor, and on UTA's multiple warnings that this behavior was unacceptable. The Board noted that Dinger's July 30, 2009 performance evaluation stated that "he was disagreeable and had shown a pattern of refusing to be coached by supervisors," his July 27, 2010 performance evaluation indicated that "he was argumentative towards his superiors," and his January 5, 2011 evaluation "reiterated [UTA's] concern with [Dinger's] argumentative behavior toward his supervisors."

Although Dinger refused to sign these evaluations, he was aware that UTA considered the conduct unacceptable. In concluding that knowledge was established, the Board also relied on UTA's email to Dinger, reprimanding him for yelling at his supervisor and explaining UTA's expectations for Dinger's future behavior. The Board also considered the written notification of insubordination, which stated that Dinger had violated the following rules: "officer to obey orders of supervisors," "insubordination," and "courtesy and respect for departmental members." The notification informed Dinger,

> Coaching has failed to correct the insubordinate behavior documented above. . . . Pursuant to this Written Notification, you are expected to conform to Departmental policies, to be courteous, respectful, and calm (no abusive language) . . . and are expected to obey all lawful orders from your superiors. If you fail to meet the requirements of this Written Notification, you may receive further disciplinary action up to and including termination.

¶24　Based on this history, the Board determined that while it was unclear from the testimony whether Dinger had advance notice of the June 22, 2011 *Garrity* interview, he was informed of its purpose at the meeting and had ample notice such that he either knew or should have known prior to the meeting the "negative consequences that could result if he failed to adhere to [UTA's] expectations." The record as a whole indicates that there is substantial evidence to support the Board's determination that Dinger had knowledge of what was expected of him.

¶25　Dinger also disputes the finding of control. "The conduct causing the discharge must have been within the claimant's control." Utah Admin. Code R994-405-202(3)(a). Dinger asserts that UTA failed to establish control because his refusal to answer questions in the *Garrity* interview was "[d]ue to his good faith reliance on his attorney's advice." Again, Dinger narrowly focuses

his argument on his refusal to answer questions at the internal affairs investigation, rather than on the course of insubordinate conduct found by the Board. Although it is true that "good faith errors in judgment are not sufficient to establish just cause for discharge," *see id.*, the Board indicated that Dinger was in control because "he could have followed instructions . . . on how to behave appropriately at work." Indeed, Dinger has not indicated that he could not have adjusted his behavior in response to the multiple coaching sessions or the notice of insubordination. Therefore, there is substantial evidence to support the Board's finding that Dinger had the ability to control his actions.

C. Reasonableness and Rationality

¶26     Dinger further argues that the Board abused its discretion in concluding that UTA had just cause to terminate him because UTA did not follow its progressive discipline policy. *See* Utah Code Ann. § 63G-4-403(4)(h) (LexisNexis 2011). "When we review an agency's application of the law to a particular set of facts, we give a degree of deference to the agency." *EAGALA, Inc. v. Department of Workforce Servs.*, 2007 UT App 43, ¶ 9, 157 P.3d 334 (citation and internal quotation marks omitted). Dinger's argument is based on the fact that several of the allegations of insubordination resulted in "coaching sessions," which are defined by UTA policy as "non-disciplinary." While Dinger is correct, he points to nothing in the UTA policy that required it to move immediately to disciplinary action. Furthermore, the Board properly considered those non-disciplinary attempts to cure Dinger's behavioral issues in assessing UTA's conduct. Rather than immediately pursuing disciplinary action, UTA tried to modify Dinger's behavior through less formal means. It was only after those informal efforts failed that UTA provided Dinger with a written notification that his behavior, if uncorrected, could result in termination. Dinger does not explain how UTA's attempt at leniency violated its policies or undermines the Board's conclusions.

¶27    Once UTA gave Dinger written notification, it could discipline him as it deemed appropriate for future violations. UTA Corporate Policy Number 6.3.1 states that a "Written Notification . . . sets clear expectations and may include consequences if performance does not improve." The notice specifically indicated that Dinger could be terminated if he failed "to obey all lawful orders." Yet, after receiving this warning, Dinger refused UTA's order to participate in the *Garrity* interview. Additionally, the policy states that it is a flexible tool to be used "on a case by case basis," that it does not create a contract, and that it does not "alter the employment-at-will relationship." The Board's decision does not exceed the bounds of reason or rationality simply because UTA attempted to correct Dinger's behavior through non-disciplinary coaching sessions before issuing a written notification of insubordination.

## II. Voluntary Separation for Good Cause

¶28    Dinger argues for the first time on appeal that he should be eligible for benefits because he quit for good cause. "When a party raises an issue on appeal without having properly preserved the issue below, we require that the party articulate an appropriate justification for appellate review." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (citation and internal quotation marks omitted); *see also* Utah R. App. P. 24(a)(9). Dinger asserts that he preserved this argument in his request for reconsideration, in which he moved to present additional evidence so that the Board could fulfill its duty to consider all facts relevant. However, the request makes no mention of any theory that suggests Dinger's dismissal should be treated as voluntary under the circumstances. Our preservation rule requires that an issue "be raised in a timely fashion[,] . . . specifically raised[,] and . . . [that] the challenging party . . . introduce supporting evidence or relevant legal authority." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (first and third alteration in original) (citation and internal quotation marks omitted). "The preservation rule applies in agency appeals 'when the issue raised on appeal could have been resolved in the adminis-

trative setting.'" *Rosen v. Saratoga Springs City*, 2012 UT App 291, ¶ 31, 288 P.3d 606 (quoting *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶¶ 10–11, 211 P.3d 382 (elaborating on scenarios in which the preservation rule applies in agency appeals)); *see also In re Anderson*, 2004 UT 7, ¶ 47, 82 P.3d 1134 (per curiam) ("In agency appeals, . . . it is logical to require matters that may be dispositive to be presented in the first instance to the agency, so that it may consider them at the time of reaching its decision."). A general reference to "all facts relevant" was not sufficient to put the Board or UTA on notice that Dinger intended to raise the new theory that he had voluntarily quit for good cause. Thus, the issue is unpreserved.

¶29 Alternatively, Dinger argues that the Board plainly erred by not determining on its own motion that Dinger was eligible for unemployment benefits because he left for good cause or that denying him benefits would be against equity and good conscience. *See* Utah Admin. Code R994-405-101 to -103. "Plain error requires the showing of a harmful error that should have been obvious to the district court, or in this case, the Board." *See Utah Chapter of Sierra Club v. Air Quality Bd.*, 2009 UT 76, ¶ 26, 226 P.3d 719. To establish plain error, Dinger must show that "(i) an error exists; (ii) the error should have been obvious to the [Board]; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for [Dinger]." *See State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (citation and internal quotation marks omitted).

¶30 We first evaluate whether this theory should have been obvious to the Board. To establish obviousness, Dinger "must show that the law governing the error was clear at the time the alleged error was made." *See id.* Dinger cites no authority to support his position that it should have been obvious to the Board that he quit for good cause because of a hostile work environment. Additionally, the Board rejected Dinger's factual assertions concerning UTA's motivation, instead finding that UTA's allegations against Dinger were credible. *See supra* ¶¶ 20–21; *see also*

*Davis v. Department of Workforce Servs.*, 2012 UT App 158, ¶ 6, 280 P.3d 442 ("[W]e defer to the Board's assessment of credibility and resolution of conflicting evidence." (citation and internal quotation marks omitted)). Accordingly, the Board did not plainly err when it did not find that Dinger voluntarily quit for good cause.

## III. The *Garrity* Interview

¶31     Next, Dinger argues that the Board exceeded the bounds of reasonableness and rationality when it determined that his refusal to answer questions in the *Garrity* interview constituted insubordination. In support of his argument, Dinger contends that UTA has no policy regarding *Garrity* warnings and that it used the warning as a pretext to fire him in violation of statutory protections for whistleblowers.

¶32     Before we address Dinger's argument, we pause to clarify the nature of a *Garrity* warning. In *Garrity v. New Jersey*, 385 U.S. 493 (1967), police officers under internal investigation for allegedly fixing traffic tickets were interviewed by their department about the allegations. *Id.* at 494. Before the interview, they were notified that they could be terminated if they refused to answer questions, but that any answers could also be used as evidence against them in any criminal prosecution. *Id.* The officers answered the questions, and over their objections, some of those answers were used against them in a subsequent criminal proceeding. *Id.* at 495. On appeal from their convictions, the Supreme Court equated requiring a police officer to choose between sacrificing his career or his Fifth Amendment right against self-incrimination with coercion, stating that it was "'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.'" *Id.* at 497 (quoting *Miranda v. Arizona*, 384 U.S. 436, 464–65 (1966)). Thus, the court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office." *Id.* at 500.

¶33    In response to this decision, police departments routinely engage in the practice of advising officers who are the subject of an internal investigation that their answers will not be used in any criminal prosecution, while also warning the subject of the investigation that the refusal to answer questions may be grounds for termination. Here, there is no evidence to suggest that Dinger was under investigation as a result of any suspicion that he was engaged in criminal activity. Thus, he is correct that the *Garrity* warning was likely unnecessary. *See Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 17, 171 P.3d 474. However, he has pointed us to nothing that would prevent UTA from issuing the *Garrity* warning in the unlikely event that the interview uncovered unexpected criminal activity.

¶34    We next consider Dinger's argument that the *Garrity* interview was merely a pretext to shield UTA from the whistleblower statute. In support of his claim that the interview was a pretext, Dinger argues that the "very people against whom [Dinger] filed complaints intended to conduct an internal affairs interview on the precise topics that were the focus of his complaints." The Board counters that the testimony before the ALJ supported UTA's claim that it terminated Dinger for several acts of insubordination, of which refusing to participate in the interview was the final culminating act. Indeed, UTA indicated that it delayed its termination of Dinger so that it could first "deal with the allegations so that he wouldn't be able to say it was retaliatory."

¶35    The Utah Legislature has provided protections to employees who report wrongdoing by their employers. Specifically, Utah Code section 67-21-3(1)(a) provides,

> An employer may not take adverse action against an employee *because* the employee . . . communicates in good faith the existence of any waste of public funds, property, or manpower, or a violation or suspected violation of a law, rule, or regulation adopted under

the law of this state, a political subdivision of this state, or any recognized entity of the United States.

Utah Code Ann. § 67-21-3(1)(a) (LexisNexis 2011) (emphasis added).

¶36    From its plain language, section 67-21-3(1)(a) evidences the Utah Legislature's intent to protect employees who in good faith report their employers' violations from disciplinary action instigated by the employer because of the report. *See id*. However, nothing in the statute suggests that an employee who has made a good faith report of his employer's violation is shielded against legitimate disciplinary actions. *See id*. Instead, the protection afforded by the statute is dependent upon whether the employer's adverse actions against the employee were taken because the employee reported the violation. Here, the Board rejected Dinger's characterization of UTA's motives, instead finding that UTA disciplined Dinger because of his repeated acts of insubordination. As a result, Dinger has not established that he was terminated *because of* his complaints against UTA employees. *Cf. Baird v. Cutler*, 883 F. Supp. 591, 606 (D. Utah 1995) (holding there was no violation of Utah Code section 67-21-3 where reprimands did not mention the subject of the complaint but did "reference . . . [the employee's] failure to follow the proper reporting procedures and protocol").

IV. Dinger's Request for Reconsideration

¶37    Finally, Dinger asserts that the Board abused its discretion in refusing to remand the matter to the ALJ for the introduction of additional evidence and to reconsider its eligibility determination in light of that new evidence.[5] *See* Utah Code Ann. § 63G-4-302

---

5. In the request, Dinger asserts that his attorney was originally cut off by the ALJ during questioning to support his theory that he was terminated in retaliation for "raising wrongdoing of UTA such as

(continued...)

(LexisNexis 2011). The basis of Dinger's argument is that the record before the Board was incomplete because UTA introduced only three of his performance evaluations. However, we decline to consider this argument because it is not adequately briefed as a challenge to the Board's decision to decline his request for reconsideration. *See generally* Utah R. App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented[.]"); *State v. Garner*, 2002 UT App 234, ¶ 8, 52 P.3d 467 ("It is well established that Utah appellate courts will not consider claims that are inadequately briefed."). Although Dinger makes vague references to the adequacy of the record before the Board, he does not directly challenge the Board's denial of his request for reconsideration on this ground. That argument is addressed only in his reply brief, and we decline to consider it. *See generally* Utah R. App. P. 24(c) ("Reply briefs shall be limited to answering any new matter set forth in the opposing brief."); *Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 ("[W]e will not consider matters raised for the first time in the reply brief.").

CONCLUSION

¶38    The Board's findings are supported by substantial evidence and its application of the law to the facts does not exceed the bounds of reason and rationality. We decline to reach Dinger's argument regarding reconsideration because it is inadequately briefed. Accordingly, we do not disturb the Board's decision denying Dinger unemployment benefits.

---

5. (...continued)
officers criminally mistreating UTA riders . . . and reporting false UTA ridership numbers in order to increase federal funding for UTA . . . ." Although Dinger acknowledged the ALJ later invited him to ask those questions, he did not do so "because it was evident that the ALJ was deciding in [Dinger's] favor."

———————————