2022 UT App 34

# THE UTAH COURT OF APPEALS

CHARLES HOFFMAN,
Petitioner,

*v.*

PEACE OFFICER STANDARDS AND TRAINING COUNCIL,
Respondent.

Opinion
No. 20200329-CA
Filed March 10, 2022

Original Proceeding in this Court

Jeremy G. Jones and Richard Willie, Attorneys
for Petitioner

Sean D. Reyes and Catherine F. Jordan, Attorneys
for Respondent

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

HAGEN, Judge:

¶1    The Peace Officer Standards and Training Act (the Act) permits the decertification of a peace officer who "refuses to respond, or fails to respond truthfully, to questions after having been issued a warning issued based on *Garrity v. New Jersey*, 385 U.S. 493 (1967)." Utah Code Ann. § 53-6-211(1)(d) (LexisNexis Supp. 2021). Petitioner Charles Hoffman was decertified under this provision and now seeks judicial review. We decline to disturb Hoffman's decertification.

BACKGROUND[1]

¶2     Prior to his decertification, Hoffman worked as a police officer for the Box Elder County Sheriff's Office (Box Elder). In May 2018, Hoffman learned that a neighboring law enforcement agency had been tasked with investigating an incident involving one of his fellow officers. Hoffman was not on good terms with the officer involved and, despite being prohibited from doing so, approached several officers from the neighboring agency and asked them about the investigation. Three of these officers reported Hoffman to their superiors, and word eventually reached Box Elder.

¶3     In response to those reports, Hoffman was interviewed by two of his superior officers on May 31, 2018. At the outset of the interview, Hoffman received a written statement of rights, captioned, "Box Elder County Sheriff Garrity Warning." The statement indicated that Hoffman was "to fully cooperate with the investigating official(s)" and that Hoffman's statements could "be used as evidence of misconduct or as the basis for seeking disciplinary action." It further provided, "Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding, nor can the fruits of any of your statements be used against you in any subsequent criminal proceeding." One of Hoffman's superiors read the statement aloud to him, and Hoffman signed an acknowledgment of understanding.

---

1. "Because the party seeking review of an agency's order following a formal administrative proceeding has the burden to prove that the agency's factual findings are not supported by substantial evidence, we state the facts and all legitimate inferences to be drawn from them in the light most favorable to the agency's findings." *Macfarlane v. Career Service Review Office*, 2019 UT App 133, n.1, 450 P.3d 87 (cleaned up).

¶4    Hoffman's superiors then asked whether he had discussed the officer-involved incident with anyone from the neighboring agency. Hoffman stated that the investigation had come up in conversation with two officers, but he denied having asked them for any specific information.

¶5    Hoffman was later re-interviewed after his superiors confirmed the stories of the officers who had reported him. This time, Hoffman admitted to discussing the investigation with four additional officers. He also indicated that he had asked the officers for the date and time of the incident, along with the name of the investigating officer. Based on those admissions, Box Elder gave Hoffman notice of potential discipline, but Hoffman left the agency before any discipline occurred.

¶6    Hoffman's case was then referred to the Division of Peace Officer Standards and Training (POST) for further action. Under the Act, POST "is responsible for investigating officers . . . alleged to have engaged in" certain enumerated acts of misconduct. Utah Code Ann. § 53-6-211(3)(a) (LexisNexis Supp. 2021). If POST believes that any of those acts have occurred, it "shall initiate [an] adjudicative proceeding[] . . . by providing to the peace officer . . . notice and an opportunity for a hearing before an administrative law judge" (ALJ). *Id.* § 53-6-211(3)(b). Then, if the ALJ finds that there is clear and convincing evidence of misconduct, POST must present the ALJ's decision to the Peace Officer Standards and Training Council (the Council), which, in turn, makes the ultimate decision regarding "whether to suspend or revoke the officer's certification."[2] *Id.* § 53-6-211(3)(d)–(e), (4)(a) (LexisNexis 2015).

---

2. The legislature has twice amended section 53-6-211 since the events of this case. *See* Utah Code Ann. § 53-6-211 (LexisNexis Supp. 2021); *id.* § 53-6-211 (LexisNexis Supp. 2020). These

(continued…)

¶7 POST initiated an adjudicative proceeding against Hoffman nearly a year after receiving Box Elder's referral, citing Hoffman's untruthful responses during the May 31st interview and "recommending that [Hoffman's] peace officer certification be revoked" under what is now subsection 53-6-211(1)(d) of the Act (Subsection (d)).[3] Under Subsection (d), the Council may decertify an officer who "refuses to respond, or fails to respond truthfully, to questions after having been issued a warning issued based on *Garrity v. New Jersey*, 385 U.S. 493 (1967)." Utah Code Ann. § 53-6-211(1)(d) (LexisNexis Supp. 2021). Hoffman promptly obtained legal counsel, denied the allegations, and requested a formal hearing under the Act.

---

(…continued)

amendments supply an alternative to suspending or revoking the officer's certification, *see id.* § 53-6-211(1) (LexisNexis Supp. 2021) ("The [C]ouncil has the authority to issue a Letter of Caution . . . ."), and provide that the Council must "accept the [ALJ]'s findings of fact and conclusions of law," *id.* § 53-6-211(4)(a)(i). "[W]e apply the law as it exists at the time of the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. Thus, when assessing Hoffman's misconduct and the adequacy of his proceedings below, we apply the version of the Act in effect at such times. *See* Utah Code Ann. § 53-6-211 (LexisNexis Supp. 2020) (hearing before the Council on May 29, 2020); *id.* § 53-6-211 (LexisNexis 2015) (misconduct on May 31, 2018; hearing before the ALJ on December 5, 2019). But where the text is identical, we cite the most recent version for convenience.

3. At the time of Hoffman's decertification, the relevant provision was contained in subsection (e) of the statute. *See id.* § 53-6-211(1)(e) (LexisNexis 2015).

¶8     After the hearing, the ALJ found that there was clear and convincing evidence that Hoffman had given "incomplete and inaccurate information" to his superiors during "the May 31st *Garrity* interview." Consequently, the ALJ concluded that Hoffman had committed misconduct as set forth in Subsection (d) and, therefore, agreed with POST's recommendation that Hoffman be decertified. Following a review hearing, the Council adopted the ALJ's findings of fact and conclusions of law and revoked Hoffman's peace officer certification.

¶9     Hoffman seeks judicial review.


ISSUES AND STANDARDS OF REVIEW

¶10    Hoffman raises "two broad issues in this case relating to statutory interpretation and application." He contends (1) that Subsection (d) is "unconstitutionally vague," and (2) that the Council "act[ed] beyond the jurisdiction conferred [on] it under" the Act.[4]

---

4. POST argues that Hoffman's arguments, in whole or in part, are unpreserved because he never raised them before the ALJ or the Council. Ordinarily, issues must be raised in the first instance before the ALJ or the Council in order to preserve them for judicial review. *See Guenon v. Division of Peace Officer Standards & Training*, 2011 UT App 105, ¶ 8, 251 P.3d 851. But Hoffman contends that the Council prevented him from making his legal arguments, while assuring him that he could nonetheless raise those issues before this court. During the hearing, one of the Council members interrupted Hoffman's counsel and stated that the Council did not have the ability to address legal arguments. The Council's attorney confirmed, "This is a legal argument, and if you'd like to address this later on in an appeal to the court of appeals, you're more than

(continued…)

¶11   "The interpretation and constitutionality of a statute are questions of law that we review for correctness." *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 5, 416 P.3d 635. This same standard applies to our review of the Council's application of the statute. *See Avis v. Board of Review Indus. Comm'n*, 837 P.2d 584, 586 (Utah Ct. App. 1992) ("When reviewing an application or interpretation of law we use a correction of error standard, giving no deference to the [Council's] interpretation of the law.").

ANALYSIS

¶12   In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that a police officer's "statements obtained under threat of removal" are inadmissible "in subsequent criminal proceedings." *Id.* at 500. The case arose after several New Jersey police officers were criminally convicted for fixing traffic tickets. *Id.* at 495. Prior to their convictions, each officer had been

---

(…continued)

welcome to [do so]." Hoffman's counsel explained that he "was not finished with [his] . . . legal arguments," but would move on as long as it was "clear that [he was] not waiving any legal arguments on . . . appeal." Under these circumstances, Hoffman may have been excused from preserving the legal issues he now raises. *Cf. State v. Ashcraft*, 2015 UT 5, ¶ 33, 349 P.3d 664 (excusing defendant's failure to specifically raise an objection where court indicated its "unwillingness to hear any further objection or explanation"). But we do not need to decide that issue here. "[B]ecause we can easily dispose of [Hoffman's] claims on their merits, we choose to exercise our prerogative to simply assume that [his] claims were preserved and proceed to consideration of the merits." *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415.

interviewed by the State, and each was informed "that, if they refused to answer [the investigators' questions], they could lose their positions with the police department." *Id.* The prosecution then used the officers' statements against them at trial on their criminal charges. *Id.* The Supreme Court condemned this practice, recognizing that the State had effectively forced each officer to choose between continued employment and exercising his Fifth Amendment right against self-incrimination, which "disable[d] him from making a free and rational choice." *See id.* at 497 (cleaned up). Accordingly, because the officers' "statements were infected by the coercion inherent in this scheme of questioning," they were inadmissible in a later criminal proceeding. *Id.* at 497, 500 (cleaned up).

¶13　"In response to [*Garrity*], police departments routinely engage in the practice of advising officers who are the subject of an internal investigation that their answers will not be used in any criminal prosecution . . . ." *Dinger v. Department of Workforce Services*, 2013 UT App 59, ¶ 33, 300 P.3d 313. Utah cases refer to these warnings as "*Garrity* warnings." *See Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶ 14, 450 P.3d 87; *Dinger*, 2013 UT App 59, ¶ 33; *Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 32 n.9, 8 P.3d 1048. Such warnings remove the coercive pressure that the Supreme Court condemned, while still allowing police departments to compel officers "to answer questions concerning their conduct . . . in a noncriminal investigation." *See Harmon v. Ogden City Civil Service Comm'n*, 2007 UT App 336, ¶ 17, 171 P.3d 474; *see also Kelly*, 2000 UT App 235, ¶ 32 n.9.

¶14　All peace officers in Utah must meet certain minimum standards and be certified by POST. *See* Utah Code Ann. § 53-6-205 (LexisNexis Supp. 2021). Section 53-6-211(1) of the Act gives the Council the authority to revoke that certification if an officer engages in certain types of misconduct. Critical to this appeal, Subsection (d) applies where an officer "refuses to respond, or

fails to respond truthfully, to questions after having been issued a warning issued based on *Garrity v. New Jersey*, 385 U.S. 493 (1967)." *See id.* § 53-6-211(1)(d). Hoffman argues that Subsection (d) is unconstitutionally vague, and that the Council lacked jurisdiction to decertify him based on his responses during the May 31st interview. We address each argument in turn.

## I. Vagueness

¶15    Hoffman argues that Subsection (d) is unconstitutionally vague because of "two glaring ambiguities": (1) it fails to dictate "the form that a *Garrity* warning may take," and (2) it fails to identify "the actor who must administer the *Garrity* warning to trigger the statute."[5] Neither of these alleged deficiencies renders Subsection (d) vague as applied to Hoffman's conduct.

¶16    "Vagueness questions are essentially procedural due process issues, i.e., whether the statute adequately notices the proscribed conduct." *State v. Frampton*, 737 P.2d 183, 191–92 (Utah 1987). A law is void for vagueness "when its prohibition is so vague as to leave an individual without knowledge of the nature of the activity that is prohibited." *See State v. Mattinson*, 2007 UT 7, ¶ 9, 152 P.3d 300 (cleaned up). Conversely, a law is not unconstitutionally vague if it "is sufficiently definite to provide adequate notice as to what conduct is proscribed." *See State v. MacGuire*, 2004 UT 4, ¶ 14, 84 P.3d 1171.

¶17    A law is void for vagueness "only if the enactment is impermissibly vague in all of its applications." *Village of Hoffman*

---

5. Hoffman also argues that Subsection (d) is unconstitutionally vague because "[i]t is highly unlikely that a person of ordinary intelligence would be able to discern the" meaning of an entire Supreme Court case. But because Hoffman raised this argument for the first time in his reply brief, it is waived. *See* Utah R. App. P. 24(b).

*Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *see also MacGuire*, 2004 UT 4, ¶ 12 ("A statute that is clear as applied to a particular complainant cannot be considered impermissibly vague in all of its applications and thus will necessarily survive a facial vagueness challenge."). A complainant "who engages in some conduct that is clearly proscribed by statute cannot complain of the vagueness of the law as applied to the conduct of others." *State v. Tulley*, 2018 UT 35, ¶ 55, 428 P.3d 1005 (cleaned up). Therefore, we "examine the complainant's conduct before analyzing other hypothetical applications of the law." *Id.* (cleaned up). "If the [complainant's] conduct is clearly prohibited, then he lacks standing to challenge the statute based on another's hypothetical conduct." *State v. Jones*, 2018 UT App 110, ¶ 16, 427 P.3d 538.

¶18 Hoffman first argues that Subsection (d) is vague because it fails to specify the form that a *Garrity* warning must take. Hoffman points out that "a warning issued based *Garrity*" could arguably refer to "a traditional *Garrity* warning" or "a Reverse *Garrity* warning." According to Hoffman, a traditional *Garrity* warning "advises government employees under investigation that they may remain silent, that they will not be fired solely because they exercise [that] right," but that "any statements they make can be used [against them] in a criminal proceeding." (Quoting *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 61 n.4 (D.D.C. 2018).) In contrast, a reverse *Garrity* warning "advises employees that they *are* required to speak to investigators, that they may face adverse employment consequences for anything they say, but that their statement will *not* be used against them in a criminal case." (Quoting *id.* (cleaned up).)

¶19 Hoffman acknowledges that he "was presented a warning in the 'Reverse *Garrity*' form" at the May 31st interview. And we have previously held that Subsection (d) applies where an officer receives that type of warning. In *Macfarlane v. Career Service Review Office*, 2019 UT App 133, 450 P.3d 87, we described a

*Garrity* warning as one that "assures officers that their statements given in a disciplinary interview will not be used against them in a subsequent criminal prosecution." *Id.* ¶ 14. We then said that an officer who "'refuses to respond, or fails to respond truthfully, to questions' after receiving" this type of warning is subject to discipline under what is now Subsection (d). *Id.* (quoting Utah Code Ann. § 53-6-211(1)(e) (LexisNexis 2015)).

¶20    This interpretation is supported by the text of the statute, which expressly applies in circumstances where the officer *either* "refuses to respond, or fails to respond truthfully." *See* Utah Code Ann. § 53-6-211(1)(d) (LexisNexis Supp. 2021). A traditional *Garrity* warning expressly permits officers to remain silent without risking employment consequences. If Subsection (d) were confined to scenarios where an officer receives a traditional *Garrity* warning, it would render the refuses-to-respond portion of the statutory text inoperable. *See State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 ("[W]e avoid interpretations that will render portions of a statute superfluous or inoperative." (cleaned up)). Accordingly, to give effect to the statutory language, Subsection (d) must at least apply in situations where the "warning issued based on *Garrity*" permits employment consequences for refusing to respond—in other words, where the officer receives the type of *Garrity* warning Hoffman received here.

¶21    Hoffman's vagueness argument asserts that the statutory language is unclear as to whether Subsection (d) also applies to an officer who chooses to provide untruthful answers following a traditional *Garrity* warning. Hoffman contends that Subsection (d) might allow an agency "to administer a traditional '*Garrity* warning' . . . placing the employee in the very penalty situation that . . . *Garrity* was designed to prevent." But that did not occur here, and he "cannot seek refuge in imaginary cases." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 22 (2010). Hoffman's

failure to respond truthfully was "clearly proscribed" by Subsection (d). *See Tulley*, 2018 UT 35, ¶ 55 (cleaned up).

¶22 We also reject Hoffman's second argument that Subsection (d) is vague because it fails to specify who must issue the *Garrity* warning. Hoffman points out that a police department is not the only entity likely to issue a *Garrity* warning during internal investigations; rather, POST itself may issue *Garrity* warnings when interviewing officers in its investigative capacity. Hoffman therefore contends that Subsection (d) is vague because it does not specify whether the *Garrity* warning must be issued by the officer's employer or POST.[6]

¶23 But Hoffman does not explain why the legislature was constitutionally required to limit the application of Subsection (d) to either scenario. Statutory language can be "broad" and yet "not so vague as to be without meaning." *In re McCully*, 942 P.2d 327, 332 (Utah 1997). Indeed, "it will almost always be true that the legislature could have more clearly" indicated when, where, and how a law is to apply. *See In re Estate of Hannifin*, 2013 UT 46, ¶ 25, 311 P.3d 1016; *Buhler v. Stone*, 533 P.2d 292, 294 (Utah 1975) ("[I]t is obviously impossible to describe in detail every act and circumstance a statute or ordinance is intended to deal with."). Parties must do more than criticize the legislature's lack of specificity; they must show that the lack of specificity operated

---

6. Hoffman further argues, without support, that "[t]he purpose of [Subsection (d)] is to authorize POST to compel . . . statements from law enforcement officers when . . . conducting [its own] investigations into criminal conduct." He also argues that our constitutional avoidance canon of interpretation requires us to interpret Subsection (d) as applying exclusively to warnings issued by POST. But these are statutory interpretation arguments; they do not support Hoffman's vagueness challenge.

to deprive them of fair notice. *Garrity* warnings, by their very nature, are only issued by entities with the power to take disciplinary action against a public employee. An ordinary person in Hoffman's circumstances would therefore understand that the obligation to answer truthfully after receiving a *Garrity* warning applies to all interviews conducted by the limited number of entities capable of imposing such discipline, including his employer.

¶24    In sum, we hold that Subsection (d) is not unconstitutionally vague as applied to Hoffman's conduct. Hoffman was interviewed by his employer after being issued a written statement of rights, captioned, "Box Elder County Sheriff Garrity Warning." That document warned Hoffman that his statements could "be used as evidence of misconduct or as the basis for seeking disciplinary action" but could not be used in a criminal prosecution. Hoffman signed a written acknowledgement that he understood the warning. Therefore, an ordinary person in Hoffman's circumstances would have had fair notice that the warning he received was a "warning issued based on *Garrity*" and that his failure to answer truthfully would subject him to possible decertification. Because Subsection (d) clearly applies to Hoffman's conduct, he cannot complain of the vagueness of the law as applied to the conduct of others.

## II. The Council's Authority

¶25    Hoffman alternatively contends that the "Council erred in interpreting its authorizing statute, when it determined it had the authority to" decertify him under the Act. Hoffman characterizes this as a jurisdictional argument.

¶26    To the extent that Hoffman challenges the Council's authority to hear and decide his case, he is mistaken. The Act expressly tasks the Council with deciding whether "to suspend or revoke the certification of a peace officer" whom POST has investigated and whom an ALJ has found to have committed an

enumerated act of misconduct. Utah Code Ann. § 53-6-211(1), (3) (LexisNexis 2015). Here, POST investigated Hoffman for allegedly violating Subsection (d), and the ALJ determined that the violation in fact occurred by clear and convincing evidence. At that point, Hoffman's case fell precisely within the class of cases that the Council had authority to hear and decide.

¶27   We understand Hoffman's argument to be that the Council lacked authority in the sense that it decertified him based on conduct not regulated by Subsection (d). In other words, Hoffman appears to challenge the Council's conclusion that he made false statements "after having been issued a warning issued based on *Garrity*." Hoffman raises two primary arguments in support of this contention, which we address in turn.

¶28   Hoffman first argues that, per Subsection (d), "a warning issued based on *Garrity*" must clearly advise the officer of the full consequences of his choice to participate. In Hoffman's view, Box Elder only warned him that failing to cooperate during the May 31st interview could result in termination, but it did not warn him of possible decertification under the Act. Hoffman therefore reasons that the *Garrity* warning was deficient.

¶29   As an initial matter, Box Elder's warning was not as narrow as Hoffman asserts. Box Elder expressly advised Hoffman that his statements could "be used as evidence of misconduct or as the basis for seeking disciplinary action against" him. This language encompasses the threat of "disciplinary action" by POST—an entity with authority to investigate and discipline peace officers for misconduct.

¶30   Moreover, Subsection (d) only calls for a warning "issued based on *Garrity*." As Hoffman acknowledges, "The crux of *Garrity* lies in the 'choice' a public employee must make regarding self-incrimination or their continued employment." If a public employee is required to answer as a condition of their

employment, the employer must remove the threat that the officer's "statements given in a disciplinary interview" could later "be used against them in a subsequent criminal prosecution." *See Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶ 14, 450 P.3d 87. Here, Box Elder assured Hoffman that his statements could not "be used against [him] in any subsequent criminal proceeding." Accordingly, that warning falls comfortably within the statutory language.

¶31 Hoffman's second argument is that the "*Garrity* warning and interview" were ineffective because Box Elder "failed to administer proper proceedings" typically associated with *Garrity* interviews. Specifically, Hoffman asserts that Box Elder "lied to him about the scope of the *Garrity* interview," pressured him to waive his right to have a witness present, and asked questions that "were not specifically, directly, and narrowly related to the performance of his official duties." None of these arguments, however, go to whether Hoffman received "a warning issued based on *Garrity*," which is all that Subsection (d) plainly requires.

¶32 But Hoffman argues that "a warning issued based on *Garrity*" refers to more than just the warning itself. He asserts that the phrase is a legal term of art encompassing the various restrictions that Box Elder allegedly violated. Hoffman then points out that, when the legislature uses a legal term of art, we must "credit" that specialized meaning and "not the common understanding of the words" themselves. *See State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517. Thus, even though Subsection (d) says nothing about other restrictions on internal affairs interviews, Hoffman argues that "a warning issued based on *Garrity*" necessarily incorporates them.

¶33 We are unpersuaded that "a warning issued based on *Garrity*" is a legal term of art. Fundamentally, Hoffman has not shown that the term has been used "long enough to have

accumulated legal tradition and certain clusters of ideas." *See Ibarra v. Holder*, 736 F.3d 903, 914 (10th Cir. 2013) (cleaned up); *see also Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (describing legal terms of art as terms "in which are accumulated the legal tradition and meaning of centuries of practice"). And although Hoffman packs his brief with authority discussing restrictions on internal affairs interviews, none of that authority suggests that the statutory language at issue here—"a warning issued based on *Garrity*"—encompasses any of those legal concepts. *See Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶¶ 33–37, 424 P.3d 22 (holding that the state workers' compensation statute did not encompass the legal tradition of its federal counterpart, where the specific language at issue was not associated with that tradition). Therefore, we interpret Subsection (d) based on its ordinary meaning.

¶34 The plain language of the statute does not support Hoffman's argument that Subsection (d) applies only when the "'proper procedures' discussed in *Garrity*'s progeny" have been followed. Hoffman might have a colorable argument if Subsection (d) referred to "interviews conducted based on *Garrity*" or used broader language such as "*Garrity* procedures" or "*Garrity* protections." But the statute does not speak to the way in which the interview must be conducted. Instead, it applies when an officer "refuses to respond, or fails to respond truthfully, to questions *after* having been issued *a warning* issued based on *Garrity v. New Jersey*, 385 U.S. 493 (1967)." *See* Utah Code Ann. § 53-6-211(1)(d) (LexisNexis Supp. 2021) (emphasis added). In other words, "a warning" is the singular event that triggers the potential application of Subsection (d) to officers who thereafter choose to not answer or to answer untruthfully. Construing "a warning" to refer to the kind of continuous, interview-wide procedural protections that Hoffman describes would be an unnatural reading of the statute's plain language. Because Hoffman chose to lie "after having been issued a

warning issued based on *Garrity*," the Council did not exceed its authority in revoking his peace officer certification.

CONCLUSION

¶35    We conclude that Subsection (d) is not unconstitutionally vague with respect to Hoffman's conduct and that the Council did not exceed its authority under the Act. We therefore decline to disturb the Council's decision.

_____