2010 UT App 203

**PEN & INK, LLC, a Utah limited liability company; and David Lynton, Petitioners and Appellants,**

v.

**ALPINE CITY, Respondent and Appellee.**

No. 20090430–CA.

Court of Appeals of Utah.

July 22, 2010.

Stephen Quesenberry and Aaron R. Harris, Provo, for Appellants.

David L. Church, Salt Lake City, for Appellee.

Before Judges McHUGH, ORME, and VOROS.

MEMORANDUM DECISION

VOROS, Judge:

¶ 1 Plaintiffs David Lynton and Pen & Ink, LLC, (collectively, Lynton) petitioned Alpine

City (Alpine) for approval of Lynton's residential building plans. The Alpine Planning Commission and the Alpine City Council both denied the request. Lynton sought judicial review. The parties filed cross-motions for summary judgment; the district court granted Alpine's motion and denied Lynton's. Lynton appeals. We affirm.

## BACKGROUND

¶ 2 In 1995, several property owners in Utah County sought to annex their subdivision to Alpine. To this end, they signed an Annexation Agreement with Alpine. The Annexation Agreement describes the terms of the annexation, including restrictions on building density, open space, and water use. The owners agreed "that a substantial portion of the annexed property is to be kept undeveloped" and that "those portions of the annexation area not included within proposed lots shall be preserved as natural open space area."

¶ 3 To maintain sufficient open space, the Annexation Agreement states that "on lots larger than 30,000 square feet . . . no more than 50% of the natural landscape will be disturbed and no more than 50% of the lot area will be fenced." However, the Annexation Agreement gives Alpine the authority to "approve minor adjustments to lot lines, street locations and similar details in the preliminary and final plat approval process where considered necessary to more adequately conform to zoning or subdivision regulations or improve the overall design of the project."

¶ 4 The Annexation Agreement was signed by each property owner in the subdivision, including Lynton's predecessor in interest. Each signature block on the signatory pages states, "The undersigned Owner of property in Utah County hereby accepts the conditions of the pr[ec]eding Annexation Agreement of the 'Freeze/Chrysalis/Sundial Willow Canyon Annexation Application' which compr[i]ses seven (7) pages, together with annexation plat and development plan also attached as exhibit 'A' and 'B.' "

¶ 5 The body of the Annexation Agreement refers to two documents. The first is described as "a policy of annexation for the properties generally known as the Freeze, Chrysalis, Sundial, Willow Canyon, annexations which is attached as Exhibit A to this agreement." The second is a "development plan which is Attachment B to the annexation policy declaration." Attached to the Annexation Agreement are two documents, neither of which is marked as Attachment A or Attachment B. One is titled the "Preliminary Plat of Willow Canyon Subdivision" (the Preliminary Plat). The other is titled "Alpine City Annexation Plat" (the Annexation Plat). The Annexation Plat provides a legal description of the territory annexed to Alpine and an outline of the annexed area. The entire Annexation Agreement, together with these two attachments, was recorded in July 1996.

¶ 6 The Preliminary Plat shows five unimproved lots, each labeled "40,000 sq. ft." The owners of four of these lots have obtained building approval from Alpine. The first, Joel Kester, was allowed to disturb 20,000 square feet of his lot. The second, the Bushmans, were allowed to disturb 30,000 square feet. According to the transcripts of the Planning Commission meeting and the City Council meeting, about the time the Bushmans applied for approval to build, Alpine's Planned Residential Development Ordinance increased the maximum permissible lot size from 40,000 square feet to 60,000 square feet. Although the change was never written into the Annexation Agreement, the Planning Commission seemed to regard the ordinance change as affecting the interpretation of the Annexation Agreement. For example, the Planning Commission Chairman stated that "Bushman's pad was then considered 60,000 and he disturbed 50% equals 30,000 sq ft."

¶ 7 The Van Leeuwens were the third lot owners to apply for permission to build. They were permitted to disturb 60,000 square feet within their ten-acre parcel. Minutes from the City Council meeting in which the Van Leeuwens' site plan was approved describe this 60,000–square–foot disturbance area not as 150% of a 40,000–square–foot lot, or 100% of a 60,000–square–

foot lot, but as "about 14% of the total lot." [1]

¶ 8 Lynton was the fourth owner of an unimproved lot to apply for permission to build.[2] Lynton owns a total of approximately fifteen acres. He petitioned Alpine to allow him to disturb approximately 90,000 square feet. He stated that after construction, he would return 30,000 square feet to its natural state.

¶ 9 The Planning Commission reviewed Lynton's petition. David Church, attorney for Alpine, spoke at the Planning Commission meeting and indicated that the intent of the Annexation Agreement was that a 40,-000–square–foot area would be considered a "lot" and that 50% of the lot could be disturbed, with the remainder being preserved through open space conservation easements. No one at the Planning Commission meeting, including Lynton's attorney, contended that the Preliminary Plat was not originally intended to be part of the Annexation Agreement. After extensive discussion, the Planning Commission voted four to three to adhere to the Annexation Agreement's lot size of 40,000 square feet and to limit Lynton to disturbing 20,000 square feet.

¶ 10 The following week, the City Council reviewed Lynton's petition. The City Council discussed the Annexation Agreement at length and considered the allowances given to previous landowners. The City Council, like the Planning Commission, considered the Preliminary Plat to be Attachment B and therefore part of the Annexation Agreement. However, noting that the Van Leeuwens had previously been allowed to disturb 60,000 square feet, the City Council voted six to zero to allow Lynton also to disturb 60,000 square feet of his property.

¶ 11 Having exhausted his administrative remedies, Lynton petitioned the district court for judicial review of the City Council's decision. Lynton and Alpine filed cross-motions for summary judgment. The Willow Canyon Homeowner's Association (the HOA) intervened, asking the district court to enforce applicable restrictive covenants as well

as the Annexation Agreement "as drafted." The HOA interpreted the Annexation Agreement "consistent with the plat map, which shows five 40,000 square foot lots, even though the parcels themselves consist of multiple acres." Thus, the HOA urged the district court to read the Annexation Agreement as limiting homeowners to disturbing up to 50% of a 40,000–square–foot lot.

¶ 12 The district court granted Alpine's motion for summary judgment and denied Lynton's. The district court concluded that the Preliminary Plat was incorporated into the Annexation Agreement as Attachment B. The text of the Annexation Agreement, it found, "incorporates by reference, and repeatedly and clearly refers to, Attachment B." The district court recognized that "the [City] Council had evidence that the Annexation Agreement had mistakenly not been enforced in the past," but ruled that the City Council's decision in Lynton's case was based on substantial evidence and thus was not arbitrary or capricious.

## ISSUE AND STANDARD OF REVIEW

¶ 13 On appeal, Lynton contends that the district court erred in granting Alpine's motion for summary judgment and denying his own, thereby upholding the decision of the City Council. He further contends that summary judgment for Alpine was improper because material facts were in dispute, in particular, whether the Preliminary Plat was part of the Annexation Agreement and thus restricted Lynton's use of his property. Alpine responds that the Preliminary Plat was part of the Annexation Agreement, and that whether an issue of material fact exists is irrelevant because, in any event, the district court's review is limited "to the record provided by the land use authority," *see* Utah Code Ann. § 10–9a–801(8)(a)(i) (2007).

¶ 14 Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). On appeal, we

---

1. One acre is 43,560 square feet; ten acres is 435,600 square feet; 60,000 square feet is 13.79% of 435,600 square feet.

2. The fifth lot owner has not yet sought permission to build.

typically review the district court's assessment of whether a genuine issue of material fact required a trial. *See Cabaness v. Thomas,* 2010 UT 23, ¶ 18, 232 P.3d 486. However, when the district court reviews a land use authority's decision, the scope of its review is curtailed by Utah Code section 10–9a–801(8). *See* Utah Code Ann. § 10–9a–801(8) (2007). Under that provision, unless there is no record, the district court's review is limited to the record before the land use authority and evidence improperly excluded by it:

(8)(a)(i) If there is a record, the district court's review is limited to the record provided by the land use authority or appeal authority, as the case may be.

(ii) The court may not accept or consider any evidence outside the record of the land use authority or appeal authority, as the case may be, unless that evidence was offered to the land use authority or appeal authority, respectively, and the court determines that it was improperly excluded.

(b) If there is no record, the court may call witnesses and take evidence.

*Id.* § 10–9a–8(a), (b); *see also Pacific W. Cmts., Inc. v. Grantsville City,* 2009 UT App 291, ¶ 12, 221 P.3d 280, *cert. denied,* 225 P.3d 880 (Utah 2010). Here, neither party has argued that the exceptions in subsection (8)(a)(ii) or (8)(b) apply. Consequently, subsection (8)(a)(i) limited the district court's review to the record before the City Council. The district court thus lacked authority to resolve any claimed factual disputes by taking additional evidence.

¶ 15 A district court will review a municipality's land use decision only after administrative remedies have been exhausted. *See* Utah Code Ann. § 10–9a–801(1). Once it obtains jurisdiction, "[t]he court[ ] shall … (i) presume that a decision, ordinance, or regulation made under the authority of [Title 10, Chapter 9a of the Utah Code] is valid; and (ii) determine only whether or not the decision, ordinance, or regulation is arbitrary, capricious, or illegal." *Id.* § 10–9a–801(3)(a). Further, "[a] final decision of a land use authority or an appeal authority is valid if the decision is supported by substantial evidence in the record and is not arbitrary, capricious, or illegal." *Id.* § 10–9a–801(3)(c).

¶ 16 When this court reviews the district court's judgment, " 'we act as if we were reviewing the land use authority's decision directly, and we afford no deference to the district court's decision. Like the review [by] the district court, our review is limited to whether a land use authority's decision is arbitrary, capricious, or illegal.' " *Pacific W. Cmts.,* 2009 UT App 291, ¶ 13, 221 P.3d 280 (quoting *Fox v. Park City,* 2008 UT 85, ¶ 11, 200 P.3d 182) (other internal quotation marks omitted). " 'A land use authority's decision is arbitrary or capricious only if it is not supported by substantial evidence in the record.' " *Id.* ¶ 22 (quoting *Fox,* 2008 UT 85, ¶ 11, 200 P.3d 182). " 'Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *Id.* (quoting *Caster v. West Valley City,* 2001 UT App 212, ¶ 4, 29 P.3d 22). " 'In determining whether substantial evidence supports [the City Council's] decision we will consider all the evidence in the record, both favorable and contrary[,] and determine whether a reasonable mind could reach the same conclusion as the [City Council].' " *Id.* (alterations in original) (quoting *M & S Cox Invs., LLC v. Provo City Corp.,* 2007 UT App 315, ¶ 36, 169 P.3d 789).

## ANALYSIS

¶ 17 We begin with the question of whether the Preliminary Plat is part of the Annexation Agreement. Although Lynton contends that it is not, the Alpine Planning Commission, the Alpine City Council, the Willow Canyon Homeowner's Association, and the district court all concluded that it is.[3] The question before us is whether a reasonable mind could reach the same conclusion. *See id.* We determine that it could.

¶ 18 To be sure, the Annexation Agreement is far from a model of draftsmanship.

---

**3.** Although the Planning Commission vote was four to three, no member of the commission took the position that the Preliminary Plat was not part of the Annexation Agreement. Similarly, none of the six members of the Alpine City Council took that position.

For example, the body of the Annexation Agreement refers to two attached documents, and two documents are attached, but the body of the Annexation Agreement refers to the documents by descriptors quite different from the titles appearing on the documents themselves. Nevertheless, a number of factors convince us that a reasonable mind could read the Annexation Agreement to include the Preliminary Plat. First, the Preliminary Plat is attached to the Annexation Agreement. Second, the body of the Annexation Agreement refers to an "Exhibit A" and an "Attachment B," and each signature block states that the Annexation Agreement is comprised of seven pages, "together with annexation plat and development plan also attached as exhibit 'A' and 'B.'" Other than the attached Preliminary Plat and Annexation Plat, no candidates exist for these two exhibits. Third, the Annexation Agreement contains a provision in which the owners agree "that *this agreement* may be recorded against the property at the Utah County Recorders office." (Emphasis added.) The Preliminary Plat and the Annexation Plat were recorded the same date and time as the Annexation Agreement.[4] Fourth, several provisions in the body of the Annexation Agreement refer to aspects of the Preliminary Plat. For example, paragraph 3.D. of the Annexation Agreement states that "[t]he maximum number of residential lots within the Willow Canyon project shall not exceed 5, to be distributed within the area as shown on Attachment B to the annexation declaration." The Preliminary Plat shows what appear to be five undeveloped residential lots. Likewise, paragraph 6.B.1, after describing how open space is to be preserved, states that the open space to be thus preserved is "[t]he open space shown on the attachment B. of the annexation policy resolution on the Kester, Strang, Redpoint, and Bushman properties."[5] The Preliminary Plat identifies these properties by name and designates portions of them as open space. Based on this infor-

mation, and according the City Council's decision the required presumption of validity, we hold that a reasonable mind could conclude that the Preliminary Plat was intended to be Attachment B and was therefore part of the Annexation Agreement.

¶ 19 Next we consider what limitations are placed on lot owners by the Annexation Agreement, including the Preliminary Plat. The Preliminary Plat shows five undeveloped lots, each labeled "40,000 sq. ft." Alpine argues that these five lots correspond to the five residential "lots" mentioned in paragraph 3.D. It further asserts that paragraph 5.B. of the Annexation Agreement prohibits landowners from disturbing more than 50% of a 40,000–square–foot lot: "[O]n lots larger than 30,000 square feet ... no more than 50% of the natural landscape will be disturbed and no more than 50% of the lot area will be fenced." Thus, according to Alpine's interpretation of the Preliminary Plat and Annexation Agreement, Lynton's maximum lot size is 40,000 square feet, of which no more than 20,000 square feet may be disturbed.

¶ 20 Lynton disagrees. He asserts that the lots shown on the Preliminary Plat do not limit his lot size to 40,000 square feet. Rather, he argues that he is entitled under the Annexation Agreement to disturb 50% of his entire parcel. His argument relies principally on the minutes of the City Council meeting in which the Van Leeuwens' site plan was approved. Those minutes state that the Van Leeuwens' plan falls within the Annexation Agreement's 50% rule because the nearly 60,000 square feet they proposed to disturb represented only "about 14% of the total lot." These numbers tally only if "the total lot" refers to the Van Leeuwens' entire ten-acre parcel. Thus, Lynton maintains, even the City Council interpreted the word "lot" to mean a landowner's entire parcel. Under this interpretation, the Annexation Agreement would allow him to disturb up to 50% of

---

4. Lynton argues that "a document entitled 'Attachment B to the annexation policy declaration' (or anything remotely resembling that title) was never recorded." This argument appears to rest on the document's title. Lynton does not contest that the Preliminary Plat was in fact recorded

contemporaneously with the Annexation Agreement.

5. Strang was Lynton's predecessor in interest; Redpoint was the Van Leeuwens' predecessor in interest.

his entire parcel. His entire parcel is fifteen acres. Thus, as he reads it, the Annexation Agreement allows him to disturb seven-and-a-half acres.[6] So while Alpine's reading of the Annexation Agreement would allow Lynton to disturb 20,000 square feet, Lynton's reading of the Annexation Agreement would allow him to disturb an unprecedented 326,700 square feet.[7]

¶ 21 Although it does find support in the minutes of one City Council meeting, we conclude that Lynton's interpretation is not the only reasonable reading of the Annexation Agreement. The Preliminary Plat makes clear that the future phases of the subdivision are projected to be mostly open space surrounding a few relatively small lots. Thus, a reasonable mind could conclude that the Annexation Agreement, including the Preliminary Plat, limits a lot owner to disturbing 50% of a 40,000-square-foot lot, regardless of how many acres the person owns, unless the City Council grants an enlargement of the disturbance area.[8]

¶ 22 The Annexation Agreement would thus seem to allow—if not require—the City Council to reject Lynton's proposal to disturb 90,000 square feet of his property. But Lynton offers another basis for his contention that the City Council acted in an arbitrary and capricious manner in rejecting his proposed site plan: the Van Leeuwens sought to disturb 60,000 square feet, or 14% of their ten-acre parcel; Lynton sought to disturb 90,000 square feet, or 14% of his fifteen-acre parcel. To grant the former request and reject the latter, Lynton argues, was arbitrary and capricious.

¶ 23 The force of this argument derives from the fact that both Lynton and the Van Leeuwens sought to disturb 14% of their entire parcels. Their proposals thus appear to be equivalent. But they are equivalent only if the relevant comparison is between the disturbed area and the entire parcel. If the relevant comparison is between the disturbed area and the 40,000-square-foot lot specified on Attachment B of the Annexation Agreement, the proposals are not equivalent. We have already determined that a reasonable mind could conclude that the intent of the Annexation Agreement was to limit owners to disturbing no more than 50% of a 40,000-square-foot lot, regardless of the size of each landowner's total parcel. The City Council allowed both the Van Leeuwens and Lynton to disturb 60,000 square feet, or 150%, of the 40,000-square-foot allotment. Accordingly, a reasonable mind could conclude that the City Council treated the two applicants in precisely the same way. Lynton's argument thus fails to establish that the City Council acted arbitrarily or capriciously.

¶ 24 Finally, Lynton argues that his interpretation of the Annexation Agreement must be correct because it justifies the City Council's decision to permit the Van Leeuwens to disturb 60,000 square feet of their property. If Alpine's reading is the correct one, Lynton reasons, the City Council was limited to approving only a 20,000-square-foot disturbance. A disturbance of 60,000 square feet was three times greater than that allowed by Alpine's own reading of the Annexation Agreement, whereas his reading of the Annexation Agreement would comfortably allow a disturbance of 60,000 square feet.

¶ 25 In response, Alpine points to a provision in the Annexation Agreement that grants it discretion to make "minor adjustments" to "improve the overall design of the project." More to the point, Alpine's counsel conceded in oral argument that the City Council made a mistake in allowing the Van Leeuwens to disturb 60,000 square feet of their property rather than enforcing the open space limitation of the Annexation Agreement according to its terms. Counsel

---

6. Lynton's counsel confirmed in oral argument that this accurately describes Lynton's position.

7. Seven and a half acres is 326,700 square feet.

8. Lynton also challenges the district court's statement that the Preliminary Plat at the very least put plaintiffs "on constructive notice that some document of that sort did or likely could exist in direct derogation of their property rights, creating a duty to inquire." Because we decide that a reasonable mind could conclude that the Preliminary Plat is Attachment B to the Annexation Agreement and that the Annexation Agreement, including Attachment B, limits a landowner to disturbing 50% of a 40,000-square-foot lot, we need not reach the question of constructive notice.

stated that, having realized its mistake while processing Lynton's application, the City Council in effect took the position that "we will allow you the benefit of the City's mistake and allow you to disturb up to 60,000 square feet."

¶ 26 Our review of the record does disclose, in the district court's words, "evidence that the Annexation Agreement had mistakenly not been enforced in the past," and that the City Council accordingly felt obliged to extend to Lynton the benefit of that mistake. For example, at the City Council meeting, Alpine's counsel stated,

> It appears to me on Van Leeuwen that for whatever reason, the Planning Commission, staff and City Council made a mistake in the calculation and had that 60,000 in mind [referring to the amended ordinance increasing the maximum lot size to 60,000 square feet] and instead of allowing him to disturb only 30,000 allowed him to disturb 60,000.

The mayor stated that "we've kind of been wavering and it seems to me that we will be hard pressed to not allow the 60,000 because whether right or wrong, we did that on [the Van Leeuwens' property]."

¶ 27 Thus it seems that the City Council, having mistakenly granted a 60,000–square–foot disturbance area to the Van Leeuwens, felt it could not in fairness deny an equal area to Lynton, notwithstanding the Annexation Agreement's more restrictive provisions. We have already determined that a reasonable mind could conclude that, read as a whole, the Annexation Agreement limited the disturbance area for any lot—regardless how large the owner's parcel—to 50% of 40,000 square feet, or 20,000 square feet. We need not decide whether the City Council acted arbitrarily or capriciously in allowing the Van Leeuwens to disturb three times that area. It is sufficient for us to conclude, as we do, that the City Council did not act arbitrarily or capriciously in granting equal treatment to Lynton.

## CONCLUSION

¶ 28 In sum, the decision of the City Council is entitled to a presumption of validity under Utah law. *See* Utah Code Ann. § 10–9a–801(8) (2007). Based on the record before it and the district court, we conclude that the City Council's decision in this case was not arbitrary and capricious but that a reasonable mind could have arrived at the same conclusion. We therefore affirm.

¶ 29 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and GREGORY K. ORME, Judge.