**2019 UT App 133**

### THE UTAH COURT OF APPEALS

BRADLEY MACFARLANE,
Petitioner,
*v.*
CAREER SERVICE REVIEW OFFICE AND
DEPARTMENT OF PUBLIC SAFETY,
Respondents.

Opinion
No. 20180199-CA
Filed August 1, 2019

Original Proceeding in this Court

Bret W. Rawson, Nate N. Nelson, and Jeremy G.
Jones, Attorneys for Petitioner

Sean D. Reyes and Joshua D. Davidson, Attorneys
for Respondent Department of Public Safety

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1 After lying to his supervisors about his extramarital affairs, Bradley Macfarlane lost his position as a training officer and investigator at Peace Officer Standards and Training (POST), a division of the Department of Public Safety (DPS). Macfarlane contends that the agency acted arbitrarily and requests a less serious sanction than termination. DPS counters that honesty and integrity are vital to a POST officer's job duties and that Macfarlane has lost its trust. The Career Service Review Office (CSRO) upheld DPS's decision to dismiss Macfarlane, as do we.

BACKGROUND[1]

*POST*

¶2 POST is responsible for the training and regulation of certified law enforcement personnel throughout the state. Its mission is to "promote and ensure the safety and welfare of [Utah's] citizens . . . and provide for efficient and professional law enforcement by establishing minimum standards and training for peace officers." Utah Code Ann. § 53-6-103(3) (LexisNexis 2015). To that end, POST's role is to "ensur[e] that certified individuals meet a minimum level of fitness" and to "investigate[] allegations regarding those individuals that implicate [their] certificate."

¶3 All peace officers are required to be certified, *id.* § 53-6-202(4), and officers may have their certification "suspend[ed] or revoke[d]" for several enumerated reasons, *id.* § 53-6-211(1). Typically, termination of an officer's employment does not necessarily suspend or revoke the officer's certification unless the termination was for one of the enumerated reasons. *See id.* § 53-6-211(5)(a).

¶4 Macfarlane joined POST in 2013 and holds a POST certification. His job duties at POST included investigating allegations of misconduct among certified law enforcement officers and teaching courses on topics such as report writing and ethics. Immediately before joining POST, Macfarlane

---

1. "Because the party seeking review of an agency's order following a formal administrative proceeding has the burden to prove that the agency's factual findings are not supported by substantial evidence, we state the facts and all legitimate inferences to be drawn from them in the light most favorable to the agency's findings." *WWC Holding Co. v. Public Service Comm'n of Utah*, 2002 UT 23, ¶ 2, 44 P.3d 714.

worked in Summit County as a detective. As a POST employee, Macfarlane was expected to be "beyond reproach."

*The 2015 Interview*

¶5     In the latter part of 2015, Macfarlane's supervisor at POST (Director) heard rumors that Macfarlane was having marital troubles. Director also heard that Macfarlane was having an affair with a woman named Kay.[2] In a meeting with Macfarlane (the 2015 Interview), Director asked Macfarlane "if he was having an extramarital affair with a woman named [Kay]." Though Macfarlane admitted to an "affair of the heart," he truthfully responded "no" to Director's specific question about a sexual relationship with Kay. Macfarlane later stated, however, that he understood that Director "was asking him whether he was having an affair generally, not specifically [with] one woman." And as to that query, Macfarlane did not respond truthfully. Macfarlane even apologized to another supervisor (Captain) for "lying to Director" and being "deceptive" during the 2015 Interview. As put by Macfarlane in a later interview, "I'm not an idiot. . . . I knew where [Director] was going" with his question.

*Macfarlane's Affairs*

¶6     As it turned out, Macfarlane had affairs with five women—none of whom were named Kay. One of these women, Amy, was sexually involved with Macfarlane from November 2014 through late 2015, but they knew each other for a "few years" before that. In early 2015, Amy called Macfarlane to help her with a criminal matter she was involved in for writing bad checks. Macfarlane looked up Amy's case on a police database and discovered that the Draper Police Department was handling

---

2. The names of the women associated with Macfarlane are changed to preserve their privacy.

the matter and that he knew the detective (Detective) assigned to the case. He then put Amy in touch with Detective.

¶7     Amy later informed Macfarlane that she resolved her debt and, with Detective's assistance, was able to get the charges against her dismissed. But she also informed Macfarlane that Detective, after taking her to a restaurant, tried to kiss her in his patrol car and asked if she wanted to have sex. Amy asked if this kind of behavior was normal, and Macfarlane responded that he thought it sounded "predatory" and asked her if she wanted to file a complaint. Amy declined, and Macfarlane did not record the incident in POST's complaint log or notify Detective's superiors at the Draper Police Department about what he had been told.

*The Draper Investigation*

¶8     Nearly a year later, Macfarlane did tell a sergeant at POST (Sergeant) about Amy's incident with Detective. Sergeant relayed the information to Detective's supervisor, which prompted an investigation (the Draper Investigation). The Deputy Chief at the Draper Police Department (Deputy Chief) called Sergeant for more information, and Sergeant asked Macfarlane to contact Deputy Chief and provide what details he could. After Sergeant made that request, Macfarlane's "demeanor changed" and he "appeared extremely nervous." Macfarlane asked Sergeant, over and over, "Why did you do this?" and said, "I'm going to lose my job. I'm going to be in so much trouble." Macfarlane explained, "I should have put it on the complaint log, and I didn't."

¶9     Macfarlane then called Deputy Chief, who asked for identifying information about Amy so that he could investigate the matter. According to Sergeant, Macfarlane "minimiz[ed] his knowledge of [Amy]" while "appear[ing] to be helpful." In response to Deputy Chief's inquiry, Macfarlane said that he knew only Amy's first name and did not have her telephone

number. He described his interaction with Amy as a "half a dozen texts, maybe two phone calls, and a face-to-face at the gym" they both attended. And when asked about Amy's last name, Macfarlane said, "It seems to me like it's a, like a Hispanic last name, but I can't recall."

¶10   Without more information, the Draper Police Department was unable to find Amy. When Macfarlane asked Sergeant if they had found Amy, Sergeant responded "no" because they had only her first name. This answer prompted Macfarlane to remark how easily he could have found her. On another occasion, nearly a year after the phone call with Deputy Chief, Macfarlane came to talk to Sergeant about "how [Macfarlane was] an awesome detective" and how Deputy Chief "doesn't know what he's doing," because he should have already found Amy. Sergeant wondered how the Draper Police Department should have found Amy with only a "common first name like that," and Macfarlane said that "they could have searched through" his Facebook friends or through her work address. Sergeant replied, "You never gave her last name," and Macfarlane said, "Yes, I did." Sergeant challenged this assertion[3] and told Macfarlane that "Draper might still be interested in that" information. Sergeant then asked Macfarlane whether he was "going to tell them [how to find Amy] today." Macfarlane responded, "Not unless they ask."

¶11   After her conversation with Macfarlane, Sergeant called Deputy Chief, who was planning to meet with Macfarlane on an unrelated matter that day. Sergeant suggested that Deputy Chief ask Macfarlane about Amy because he had more information. Deputy Chief asked "why . . . Macfarlane sat on this information for so long," and Sergeant told him she "did not know." Deputy

---

3. The audio recording of the phone call with Deputy Chief confirms that Macfarlane did not provide Amy's last name during the conversation. *See supra* ¶ 9.

Chief said that he knew "Macfarlane knew more about [Amy]" than he let on in their earlier phone conversation. On another occasion, however, Deputy Chief said that he had no issues with Macfarlane.

¶12    After Macfarlane's meeting with Deputy Chief, Macfarlane told Sergeant that "he was able to point out [Amy] . . . in two seconds" and that "he should be a Deputy Chief somewhere because it was so easy." Sergeant asked why he could not have found Amy last year when Deputy Chief first asked, and Macfarlane said that he did "not want [Amy] or her drama in his life."

*The 2017 Interview*

¶13    In February 2017, Macfarlane's supervisors—Director and Captain—still had concerns about Macfarlane's work performance and rumors of his affairs. After interviewing Macfarlane's coworkers, who said that Macfarlane was easily distracted and was often gone from the office for long periods, Director and Captain interviewed Macfarlane (the 2017 Interview). Director told Macfarlane that he wanted a "very direct interview" and expected Macfarlane to be "completely honest." Captain then gave Macfarlane a written *Garrity* warning, which Macfarlane signed.

¶14    A *Garrity* warning assures officers that their statements given in a disciplinary interview will not be used against them in a subsequent criminal prosecution. *See Garrity v. New Jersey*, 385 U.S. 493, 500 (1967); *Kelly v. Salt Lake City Civil Service Comm'n*, 2000 UT App 235, ¶ 32 n.9, 8 P.3d 1048. But an officer who "refuses to respond, or fails to respond truthfully, to questions" after receiving a *Garrity* warning is subject to "suspen[sion] or revo[cation]" of his or her POST certification. Utah Code Ann. § 53-6-211(1)(e) (LexisNexis 2015). Indeed, under POST guidelines, if an officer is untruthful in an interview after receiving a *Garrity* warning, the officer's certification will usually

be revoked. However, it was also POST's practice at the time that if an officer initially lied during an interview but told the truth before the interview ended, POST would not revoke the officer's certification based on a *Garrity* violation.

¶15 Director had not previously used a *Garrity* warning in conjunction with a preliminary investigation of DPS employees for disciplinary matters. But Director decided that a *Garrity* warning was warranted in this situation because he "didn't have time for someone to decide if they were going to tell . . . the truth. [He] needed it right away." Director also wanted to protect Macfarlane from criminal liability because he "did not know what was going to come out" during the interview based on Macfarlane's "history" and "past conduct."

¶16 Macfarlane was questioned about a number of topics: an inappropriate Facebook post; a high-speed pursuit in which Macfarlane tried to get involved; Macfarlane's time away from the office; and, finally, allegations of extramarital affairs.[4] For approximately twenty minutes, Macfarlane "created detailed denials" to his supervisors' inquiries about alleged affairs with specific women. Macfarlane also texted his wife during the interview. Macfarlane and his wife had previously decided that "they would lie about [his] affairs should the need arise." But after receiving a text from his wife that it "was up to him" whether he wanted to divulge the affairs, Macfarlane's "story changed." Before the interview ended, he admitted to having affairs with five women, including women "he had specifically denied having affairs with previously."

---

4. According to Director, the "main reason for asking about affairs was to determine whether it was on or off duty because [on-duty affairs] would fall under [POST's] jurisdiction to investigate." *See* Utah Code Ann. § 53-6-211(1)(f) (LexisNexis 2015).

¶17   Macfarlane apologized to Director for not initially telling the truth but explained that he wanted to tell his wife first that he would be revealing his affairs. Macfarlane said he knew that his conduct reflected poorly on POST and "disrupt[ed] [its] trust." Director then informed Macfarlane that the Office of Professional Standards, otherwise known as Internal Affairs (IA), would likely investigate.

*IA and the Decision to Terminate*

¶18   IA has the responsibility "to investigate allegations of misconduct" on behalf of DPS employees and "to protect the good name" of DPS and its divisions. Whereas POST investigates an officer's certification, IA investigates "particular policy violations that relate to" DPS more broadly.

¶19   IA was directed to conduct a "Category I" investigation of Macfarlane.[5] In a final written report, IA found that "Macfarlane created a conflict of interest" with regard to the Draper Investigation and "was less than forthright with his supervisors when asked about his relationships with other women."

¶20   Following IA's investigation and report, DPS gave Macfarlane its notice of intent to terminate his employment. DPS identified four of its policies that it believed Macfarlane violated.[6] The factual bases for its belief included that (1) Macfarlane omitted information and misled his supervisors about his extramarital affairs, (2) Macfarlane omitted

---

5. Category I investigations are reserved for violations "of a more serious nature . . . that generally involve moral turpitude issues, honesty issues, and allegations of criminal conduct."

6. The identified policies generally proscribe dishonesty or conduct that jeopardizes the public trust, whether an officer is on or off duty.

information and misled another law enforcement agency in the Draper Investigation, and (3) Macfarlane compromised the integrity of POST and DPS.

¶21 Director told Macfarlane that termination, rather than a less serious sanction such as a transfer, was warranted. Director could not transfer Macfarlane out of POST because Macfarlane "had not gone through the requirements that other certified officers had to go through."[7] Director also was not comfortable transferring Macfarlane within POST from investigation to training, "because [Director] worried about [Macfarlane] working closely with young recruits" and "was concerned that [Macfarlane] would be unable to teach the ethics and codes of conduct with any credibility." Finally, Director could not keep Macfarlane as an investigator "due to [his] pattern of falsehoods."

¶22 DPS's Commissioner (Commissioner), who ultimately had the final say on Macfarlane's sanction, likewise determined that termination was appropriate. Commissioner looked for "comparable cases [that] were on-point with [Macfarlane's] conduct" to determine the proper discipline. The human resource department produced several cases, but Commissioner concluded that none were comparable to Macfarlane's situation. He considered Macfarlane's actions "especially severe in that he withheld information from another law enforcement agency, and . . . had a negative effect on POST's operations." Although DPS tries to use "progressive discipline," Commissioner "believed [Macfarlane's] misconduct was sufficiently egregious to justify dismissal." Macfarlane then appealed his termination to the CSRO.

---

7. Macfarlane came to POST directly after being a detective in Summit County. He therefore had not received the same training that other officers receive through the Utah Highway Patrol.

*The CSRO Proceedings*

¶23    The issue before the CSRO was whether there was "a basis in law and fact to support [DPS's] decision to dismiss [Macfarlane]." The CSRO concluded that DPS "had substantial evidence on which to base its decision."

¶24    Noting its own restricted role in reviewing agency action, the CSRO concluded that DPS "carried its burden" in showing that dismissal was warranted. The CSRO found that "POST required adherence to the highest ethical standards" and that Macfarlane "failed to cooperate with a separate law enforcement agency"; "repeatedly lied to his supervisors"; "failed to volunteer information he had, or easily could have obtained"; and "only eventually revealed the truth" after being pressured. All in all, the CSRO determined that DPS "took appropriate action after being confronted with extensive evidence that [Macfarlane] had violated DPS and POST policies and rules, and harmed (or potentially harmed) the credibility and reputation of a Division which needs to operate at the highest standards if it is to have any credibility at all."

¶25    The CSRO also rejected Macfarlane's contention that POST had abused its prior *Garrity* practice. Macfarlane asserted that he did not "lie under *Garrity*," and therefore should not have been punished, because he was eventually truthful in the 2017 Interview. The CSRO reasoned that "[i]f . . . POST[] had attempted to take action against [Macfarlane's] POST certification . . . , that argument might be compelling." But the CSRO determined that that "is not what happened"; POST did not take action against Macfarlane's certification but only became concerned that Macfarlane "had lied to them for some time" and "had violated a number of DPS and POST policies and rules." POST then referred the matter to IA for an investigation, which confirmed that Macfarlane had violated a number of DPS policies.

¶26　Finally, the CSRO went through the proportionality factors set forth in *Ogden City Corp. v. Harmon*, 2005 UT App 274, 116 P.3d 973, and concluded that DPS's "decision to dismiss [Macfarlane] was not disproportionate to his conduct." Specifically, the CSRO concluded that the following factors weighed in favor of DPS's decision: (1) Macfarlane was "dishonest"; (2) Macfarlane's violations were "directly related to [his] official duties and significantly impede[d] his . . . ability to carry out those duties"; (3) Macfarlane's offenses were "of a type that adversely affects the public confidence in the department"; (4) Macfarlane's offenses "undermine[d] the morale and effectiveness of the department"; and (5) Macfarlane's offenses were "committed willfully or knowingly, rather than negligently or inadvertently." (Quoting factors (3), (6), (7), (8), and (9) from *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 38, 405 P.3d 937.)

¶27　Macfarlane now petitions this court for review of the CSRO's decision upholding his dismissal from POST.

ISSUES AND STANDARDS OF REVIEW

¶28　Macfarlane raises three issues. First, he contends that the CSRO lacked substantial evidence on "two core findings" supporting DPS's decision to terminate his employment: that he was dishonest with Director in the 2015 Interview and that he did not cooperate in the Draper Investigation. Second, Macfarlane contends that the CSRO erred in concluding that POST did not violate its prior practice regarding *Garrity* interviews. Finally, he contends that the CSRO failed to make adequate findings on the proportionality and consistency of DPS's decision to terminate.

¶29　This court's authority to review the CSRO's decision is derived from the Administrative Procedures Act (Act). Utah Code Ann. § 63G-4-403(1) (LexisNexis 2016); *Burgess v.*

*Department of Corr.*, 2017 UT App 186, ¶ 14, 405 P.3d 937. That Act provides that we may grant relief only if we determine that a petitioner "has been substantially prejudiced" by, among other things, (1) the agency acting contrary to its prior practice or (2) the agency basing its action upon a factual determination "that is not supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63G-4-403(4)(g), (h)(iii).

¶30 As the Act itself suggests, we review a challenge to the CSRO's findings of fact to determine whether substantial evidence supported POST's allegations. *Id.* § 63G-4-403(4)(g); *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242. And we review claims that an agency decision is contrary to the agency's prior practice to determine if the agency's explanation for its action is reasonable and rational.[8] Utah Code Ann. § 63G-4-403(4)(h)(iii); *Benson v. Peace Officer Standards & Training Council*, 2011 UT App 220, ¶ 11, 261 P.3d 643.

¶31 As for Macfarlane's adequacy-of-the-findings challenge, an agency's findings "should be sufficiently detailed to disclose the steps by which the ultimate factual conclusions, or

---

8. Macfarlane argues for a correctness standard for POST's alleged deviation from prior practice. His argument misses the mark. He relies on *Pickett v. Utah Department of Commerce*, 858 P.2d 187 (Utah Ct. App. 1993), for the proposition that challenges under Utah Code section 63G-4-403(4)(h)(iii) (contrary to prior practice) are reviewed for correction of error. But in *Pickett*, we applied the correctness standard only to our review of the agency's *interpretation* of that section of the Act, explaining that our review of the agency's *explanation* for its deviation from prior practice "will be on the basis of 'reasonableness and rationality.'" *Id.* at 191 (quoting *SEMECO Indus., Inc. v. Auditing Div. of the Utah State Tax Comm'n*, 849 P.2d 1167, 1174 (Utah 1993) (Durham, J., dissenting)); *see also id.* at 191 n.8.

conclusions of mixed fact and law, are reached." *Milne Truck Lines, Inc. v. Public Service Comm'n of Utah*, 720 P.2d 1373, 1378 (Utah 1986).

## ANALYSIS

### I. The CSRO's findings are supported by substantial evidence.

¶32    Macfarlane contends that the CSRO lacked substantial evidence for two findings: (A) that he was dishonest with Director in the 2015 Interview and (B) that he did not cooperate with the Draper Investigation.

¶33    "'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Board of Equalization of Salt Lake County*, 799 P.2d 1163, 1165 (Utah 1990). "It is more than a mere scintilla of evidence and something less than the weight of the evidence." *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 16, 405 P.3d 937 (cleaned up). "In determining whether substantial evidence supports [the CSRO's] decision we will consider all the evidence in the record, both favorable and contrary, and determine whether a reasonable mind *could* reach the same conclusion as the [CSRO]." *See Pen & Ink, LLC v. Alpine City*, 2010 UT App 203, ¶ 16, 238 P.3d 63 (emphasis added) (cleaned up). And in reviewing the CSRO's findings, we do not "reweigh the evidence." *Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997). Moreover, "we defer to the [CSRO's] findings on issues of credibility." *Id.*

¶34    As we defer to the CSRO, we note that the CSRO must likewise defer to the agency. *See Sorge v. Office of Att'y Gen.*, 2006 UT App 2, ¶ 22, 128 P.3d 566. The CSRO "is restricted to determining whether there is factual support for the [agency's] charges against a grievant." *Id.* (cleaned up). Under these

standards, we examine whether the CSRO's two core findings are supported by substantial evidence.

A.     There is substantial evidence that Macfarlane was dishonest in the 2015 Interview.

¶35     In the 2015 Interview, Director asked Macfarlane about an extramarital affair with Kay. Macfarlane asserts that he "was honest in his response to the specific question he was asked" and that the CSRO erred in finding otherwise. He reasons that, in effect, the CSRO "determined that [he] was dishonest because he knew or should have known what was being asked of him, even though he was not actually asked about affairs generally." Further, Macfarlane cautions that "[i]f an agency can simply re-cast questioning after the fact and assert that an officer should have known what [the questioner was] really getting at[,] merit employee protections would become meaningless." (Cleaned up.)

¶36     There is some force to this argument. Indeed, answering a specific question honestly would not normally serve as grounds for a finding of general dishonesty. But Macfarlane ignores a unique fact in this case: he admitted to Director and Captain that he "l[ied] to Director" and was "deceptive" during the 2015 Interview. Macfarlane told Director that he knew Director "was asking him whether he was having an affair generally, not specifically [with Kay]." Macfarlane also apologized to Captain for "lying to Director" and being "deceptive" in the 2015 Interview. And in his interview with IA investigators, he said, "I'm not an idiot . . . I knew where [Director] was going" with his questioning. We do not decide whether there would be substantial evidence of dishonesty in the 2015 Interview absent Macfarlane's explicit and numerous admissions of deceit. But given the unique facts here, we conclude that "a reasonable mind could" conclude that Macfarlane was dishonest with Director in the 2015 Interview and that substantial evidence

therefore supports the CSRO's finding. *See Pen & Ink*, 2010 UT App 203, ¶ 16 (cleaned up).

B.     There is substantial evidence that Macfarlane failed to cooperate in the Draper Investigation.

¶37     Macfarlane next contends that the CSRO erred in finding that he "failed to cooperate" with the Draper Investigation. According to Macfarlane, Sergeant had only "speculation and conjecture" that Macfarlane minimized his knowledge of Amy and could have found her sooner. And Macfarlane views as "dispositive" Deputy Chief's belief that Macfarlane had been helpful in the investigation.

¶38     The CSRO found that "it defies belief that [Macfarlane] could not have assisted [Deputy Chief] more in his efforts to locate [Amy] or at least recalled her surname. [Macfarlane] was aware that another law enforcement agency was attempting [to] locate a witness, and [he] did not cooperate." We do not "reweigh the evidence" and instead "defer to the [CSRO's] findings on issues of credibility." *See Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997).

¶39     In our view, there is ample evidence that Macfarlane did not cooperate in the Draper Investigation. The Draper Police Department was unable to find Amy for nearly a year. But Macfarlane was able to locate her "in two seconds" once Sergeant informed Deputy Chief that Macfarlane had more information. Macfarlane repeatedly bragged about how easily he could have found Amy but chose not to because he did "not want [Amy] or her drama in his life." And in his phone call with Deputy Chief, Macfarlane claimed not to know the last name, or any other identifying information, of a woman he had been friends with for years and with whom he had had an affair for approximately one year. Further, Deputy Chief's subjective belief that Macfarlane had been helpful in the investigation does not weigh any heavier than Sergeant's belief, supported by clear,

reasonable inferences, that Macfarlane withheld information for personal reasons. *See id.* After all, Deputy Chief may have perceived Macfarlane as cooperative, but he was not privy to Macfarlane's conversations with Sergeant, which suggested that Macfarlane knowingly withheld information. We therefore conclude that the CSRO had substantial evidence that Macfarlane did not cooperate in the Draper Investigation. *See Pen & Ink*, 2010 UT App 203, ¶ 16.

## II. POST did not violate its prior *Garrity* practice, and even if it did, Macfarlane has not shown harm.

¶40    Macfarlane next contends that POST violated its prior practice regarding *Garrity* interviews. He asserts that "POST's prior practice regarding *Garrity* interviews was undisputed: should an officer make misstatements but subsequently clarify those misstatements before the conclusion of the interview, the officer was not determined to have lied." Because Macfarlane was truthful by the end of the 2017 Interview, he argues that his termination was unlawful.

¶41    We disagree. It is Macfarlane's burden to demonstrate a prima facie case that POST acted contrary to prior practice. *See Taylor v. Department of Commerce*, 952 P.2d 1090, 1094–95 (Utah Ct. App. 1998). Macfarlane has not met his burden. He claims that POST's prior practice was that no one would be terminated for lying under *Garrity* if the individual was eventually forthright. But the evidence on this score draws a more nuanced picture. What the CSRO found is that if an officer is eventually truthful, POST will not seek to revoke the officer's certification. The evidence Macfarlane points to in the record confirms the CSRO's understanding.[9] Here, POST did not take action against

9. Captain testified that "[i]f [officers] tell the truth in a *Garrity* interview before the end of that interview, there are no charges for violating *Garrity* that are brought forth" and clarified that by

(continued…)

Macfarlane's certification. *See* Utah Code Ann. § 53-6-211(1)(e) (LexisNexis 2015). Thus, once the relevant practice is accurately described, it is clear Macfarlane was not treated contrary to POST's prior practice. And the CSRO did not err in so concluding.

¶42 But even if Macfarlane's broad conception of POST's prior practice is right—in other words, that no one would be found in violation of department policy for lying in the course of a *Garrity* interview as long as one was truthful by the end—he has not shown that he was harmed by any inconsistent treatment. As explained above, we may grant relief from final agency action that is "contrary to the agency's prior practice" only if the petitioner seeking judicial review "has been substantially prejudiced" by that agency action. *See id.* § 63G-4-403(4)(h)(iii) (2016); *supra* ¶ 29. "A person is substantially prejudiced when the agency's [inconsistent action] is not harmless." *See Petersen v. Utah Labor Comm'n*, 2017 UT 87, ¶ 8, 416 P.3d 583 (cleaned up). "An error will be harmless if it is sufficiently inconsequential that there is no reasonable likelihood that the error affected the outcome of the proceedings." *Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 17, 245 P.3d 758 (cleaned up); *see also Covey v. Covey*, 2003 UT App 380, ¶ 21, 80 P.3d 553 (noting that the party seeking review "has the burden of demonstrating [that] an error was prejudicial" (cleaned up)).

¶43 Macfarlane again does not meet his burden. Though he recognizes the burden placed on him to show harm, he makes no argument to support the conclusion that if the supervisors did

---

(…continued)

"charges" he meant "no action on their certification." Director similarly testified that Macfarlane did not "l[ie] under *Garrity*" but that he "still lied to [him], which is a violation of [DPS] policy." Macfarlane asserts that this testimony represents "a consistent and singular *Garrity* practice." Indeed it does.

not deem him to have lied in the 2017 Interview he would not have been terminated. And we cannot conclude that it is reasonably likely that POST would not have terminated Macfarlane's employment if it did not factor Macfarlane's untruths in the *Garrity* interview into the equation. *See Smith*, 2010 UT App 382, ¶ 17. After all, the most important evidence to Commissioner—what he found "especially severe"—is that Macfarlane "withheld information from another law enforcement agency, and . . . had a negative effect on POST's operations." *See supra* ¶¶ 37–39. Further, Macfarlane was dishonest in other ways. For example, he planned with his wife to lie about his affairs should it ever be necessary, and Macfarlane admitted to dishonesty during his conversation with Director in the 2015 Interview. Thus, even assuming Macfarlane was treated contrary to POST's prior practice under *Garrity*, he has not demonstrated that POST's actions substantially prejudiced him.

### III. The CSRO's findings are adequate.

¶44    Macfarlane finally contends that the CSRO "failed to make adequately detailed findings regarding proportionality and consistency" of the decision to terminate. This argument thus focuses not so much on the substance of whether his termination was proportional and consistent but rather on whether the CSRO made adequate findings to support that conclusion. He contends that the CSRO merely "asserted that five [proportionality] factors weighed against [him] but did not explain why or how."

¶45    "An administrative agency must make findings of fact and conclusions of law that are adequately detailed so as to permit meaningful [judicial] review." *Bailey v. Retirement Board*, 2012 UT App 365, ¶ 15, 294 P.3d 577 (cleaned up). "For [courts] to meaningfully review an agency's findings, the findings must be sufficiently detailed and include enough subsidiary facts to

disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* (cleaned up).

¶46 Here, the CSRO listed the *Harmon* factors and stated that "[b]ased upon the testimony and documents in the record, . . . [DPS's] decision to dismiss [Macfarlane] was not disproportionate to his conduct." *See generally Ogden City Corp. v. Harmon*, 2005 UT App 274, 116 P.3d 973. It then found that five of the *Harmon* factors, which are used to judge proportionality, "weigh[ed] against [Macfarlane], and support[ed DPS's] decision to dismiss his employment." Specifically, the CSRO found (1) that Macfarlane was "dishonest," (2) that his violations were "directly related to [his] official duties," (3) that his actions "adversely affect[ed] the public confidence," (4) that he "undermine[d] the morale and effectiveness of the department," and (5) that his offenses were "committed willfully or knowingly." (Quoting *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 38, 405 P.3d 937.)

¶47 We have no difficulty in reviewing these findings. With respect to dishonesty (finding 1), the CSRO found, and we have already concluded substantial evidence supports, that Macfarlane was dishonest with Director in the 2015 Interview. *Supra* ¶¶ 35–36. With respect to whether Macfarlane's violation related to his official duties (finding 2), the CSRO's findings establish that Macfarlane obstructed the Draper Investigation due to a conflict of interest arising from his extramarital affair with Amy. With respect to whether Macfarlane's actions adversely affected public confidence (finding 3), the CSRO explained that "POST employees need[] to hold themselves to a higher standard and be above reproach" and that Macfarlane "harmed (or potentially harmed) the credibility and reputation of [a] Division which needs to operate at the highest standards if it is have any credibility at all." With respect to whether Macfarlane undermined the morale and effectiveness of POST (finding 4), the CSRO noted that Director was "worried about [Macfarlane] working closely with young recruits" and could

not use Macfarlane as either an investigator or a trainer. Finally, with respect to whether Macfarlane's offenses were willful or knowing (finding 5), the CSRO noted that Macfarlane and his wife "had already agreed to lie about [his affairs] if the situation arose." Thus, the CSRO's findings are adequate to permit meaningful judicial review, and we need not instruct the CSRO to revisit its findings. *See Bailey*, 2012 UT App 365, ¶¶ 15–16.

## CONCLUSION

¶48 There is substantial evidence that Macfarlane was dishonest with Director in the 2015 Interview and failed to cooperate with another agency's investigation due to a conflict of interest. Next, Macfarlane has not demonstrated that POST violated its prior practice when it terminated him. And even if POST did treat Macfarlane differently from other similarly situated employees, Macfarlane has not shown any harm from any inconsistent treatment. Lastly, the CSRO's findings are adequate to permit meaningful judicial review. We therefore decline to disturb the CSRO's decision upholding the termination of Macfarlane's employment.

———————